# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 9, 2021

Lyle W. Cayce
Clerk

No. 16-70027

Melissa Elizabeth Lucio,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:13-CV-125

---

Before Owen, *Chief Judge*, and Higginbotham, Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, and Oldham, *Circuit Judges*.*

Andrew S. Oldham, *Circuit Judge*, announced the judgment of the court and delivered an opinion joined by Owen, *Chief Judge*, and Jones, Smith, Ho, Duncan, and Engelhardt, *Circuit Judges*:

---

* This case was submitted before Judge Wilson was confirmed to our court. Judge Wilson did not take part in the consideration or decision of this case.

No. 16-70027

A Texas jury convicted Melissa Lucio of capital murder for beating to death her two-year-old daughter. The state courts affirmed her conviction and sentence on direct appeal and denied her petition for postconviction relief. Now she seeks federal habeas relief. Lucio argues that the state trial court denied her constitutional right to present a complete defense by excluding two expert witnesses from testifying at the guilt phase of her trial. The federal district court held that she cannot surmount the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Ten members of the en banc court agree with that judgment. We affirm.

I.

We begin with the tragic facts of this case. Then we turn to Lucio's proceedings in state and federal court. This case turns on the ever-evolving arguments that Lucio offered at trial, on direct appeal, in state habeas, and in federal habeas. So we recount the procedural history in detail.

A.

On the night of February 17, 2007, paramedics responded to a call at the home shared by Lucio and her husband Robert Alvarez. ROA.14936–37, 14981–82. The call concerned the couple's young daughter, Mariah. ROA.14936. When the EMTs arrived, they found Mariah on the living-room floor. ROA.14922–23, 14936. No one was near her. ROA.14922. Her body was covered with bruises in various stages of healing, her arm had been broken for several weeks, she had a bite mark on her back, and some of her hair had been pulled out. ROA.14813–16, 14937, 15051–54, 15066. She was not breathing. ROA.14923. She had no pulse. ROA.14923.

The EMTs tried to resuscitate Mariah and rushed her to the hospital. ROA.14924–28. In the emergency room, a doctor also tried to revive Mariah. ROA.14813. Those efforts were unsuccessful. ROA.14813. Mariah was pronounced dead. ROA.14813. She was two years old. ROA.14922.

No. 16-70027

On the night of Mariah's death, Lucio told the EMTs and the police that Mariah fell down the stairs. ROA.8104–05, 14924. Later that night, during a videotaped interview with investigators, Lucio explained that she had caused the bruises on Mariah's body by spanking Mariah "real hard" and by pinching her vagina. ROA.8224–25. Lucio said "nobody else would hit her." ROA.8189. As for the bitemark on Mariah, Lucio explained that two weeks before Mariah's death, while Lucio combed Mariah's hair, Lucio grew frustrated with her other "kids jumping around." ROA.8223. Although Mariah had done nothing wrong, Lucio "placed [her] mouth over [Mariah's] back and bit her." ROA.8222. During the interrogation, Lucio denied ever punching Mariah, ROA.8227, causing the scratches on Mariah's face, ROA.8228, hitting Mariah on the head, or killing Mariah. ROA.8200. But she also told investigators, "I'm responsible for it." ROA.5395.

Following the interrogation, Lucio made a phone call. A police officer who had been present with Lucio during the phone call testified that Lucio had told her sister, "Don't blame Robert. This was me. I did it. So don't blame Robert." ROA.14990–91.

The State of Texas charged Lucio with capital murder. At the trial, Lucio's sister took the stand and testified about the phone call. She denied that Lucio said, "This was me. I did it." ROA.15203. Rather, Lucio's sister said that they only discussed spanking, and that Lucio said, "I would spank the kids." ROA.15203. Lucio's sister also denied that Lucio spanked Mariah. In the sister's account, Lucio "never disciplined her children." ROA.15200.

The jury also heard testimony concerning Mariah's injuries. The forensic pathologist who performed Mariah's autopsy testified that her injuries were not the result of a fall: "[T]his is a child that's been beaten. This is a battered child." ROA.15070–71. In the pathologist's expert opinion, Mariah died from blunt-force trauma to the head. ROA.15096. At trial, the

emergency-room doctor who tried to revive Mariah testified that this was the "absolute worst" case of child abuse he'd seen in his thirty-year career. ROA.14821. To rebut this evidence, Lucio's medical expert opined that Mariah was physically abused. But he also stated that her death could've been caused by either a fall or being "[h]it by a strong force." ROA.15194.

The defense sought to call two additional expert witnesses, Dr. John Pinkerman and Ms. Norma Villanueva. The defense offered Pinkerman, a psychologist, to testify about Lucio's personal background and "psychological functioning." ROA.15301. The trial court excluded it on the ground that such evidence is relevant only at the sentencing phase of a capital trial. *See* TEX. CODE CRIM. PROC. art. 37.071(e)(1) (tasking the jury, only *after* finding the defendant guilty, with considering "the defendant's character and background," "the personal moral culpability of the defendant," and "mitigating" evidence). So to preserve the issue for appellate review, defense counsel took Pinkerman's testimony for an offer of proof.[1] Here is the entirety of what Pinkerman offered to prove in the state trial court:

> On the basis of my review of information, consultation with additional experts, and the evaluation that I have done with the defendant Mrs. Lucio, I was going to testify about the characteristics and makeup of her psychological functioning. I was also going to address how her demeanor, both immediately after the incident and during the interrogation, may be understood by understanding and appreciating the psychological elements and previous history and background

---

[1] "The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful." *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (quotation omitted). A secondary purpose is to allow the trial court "to reconsider [a] ruling in light of the actual evidence." *Ibid.* (quotation omitted).

No. 16-70027

that she has lived through. I was also going to address the notion of how difficult it might have been for her to step into some of the treatment, even though it was minimally offered. And those are the highlights.

ROA.15301. Pinkerman did not proffer any opinions on the credibility of Lucio's statements during her interrogation. As Pinkerman acknowledged in a post-trial affidavit prepared for Lucio's state habeas proceeding, that issue was "never raised at the pretrial [sic] or trial."[2] ROA.8975.

The defense also offered the testimony of Ms. Villanueva, a licensed clinical social worker, on "why [Lucio] . . . would have given police officer[s] information in [her] statement that was not correct." ROA.4691. The trial court conducted a *Daubert* hearing.[3] *See* TEX. R. EVID. 702. During it,

---

[2] Though defense counsel initially suggested Pinkerman might testify that "as a battered woman, [Lucio] takes blame for everything that goes on in the family," ROA.15293, Pinkerman's testimony in the offer of proof included no such opinion. Moreover, Pinkerman's expert report—authored two days before he made his offer of proof—says nothing about battered woman syndrome, nor does it say that Lucio takes the blame for anything. *See infra* Part III.B.3. The Texas Court of Criminal Appeals thus held that no such proffer was preserved in the trial court. *See Lucio v. State*, 351 S.W.3d 878, 902 (Tex. Crim. App. 2011) ("Therefore, appellant's claim on appeal as to what Pinkerman's testimony would have been does not comport with Pinkerman's proffered testimony at trial. Nor does it comport with what the trial attorney claimed that he was offering it for." (citation omitted)); *cf. Mays*, 285 S.W.3d at 891 (holding that an offer of proof must contain "substance" that "rises to the level contemplated in our Rules of Evidence and this court's precedent" in order to preserve an issue for appellate review); *ibid.* ("[T]his sort of summary, in the most general and cursory terms, without any of the meat of the actual evidence, will not suffice to preserve error.").

[3] The term "*Daubert* hearing" is a shorthand for the inquiry that federal district courts conduct before admitting expert testimony under the *federal* rules of evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). While the Supreme Court's decision in *Daubert* applies only to federal proceedings, the Texas Court of Criminal Appeals has described the inquiry under the Texas Rules of Evidence as "virtually identical" to the standard set out in *Daubert*. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997) (en banc); *accord Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App.

No. 16-70027

Villanueva said her expertise derived from "clinical training and clinical experience, . . . a combination of knowing life span development theories, clinical theories[,] and human behavior social environment interaction theories," ROA.4695, as well as training in deciphering body language from "clinical sources in [her] master's degree, [and] continuing education courses," ROA.4697. On the basis of that experience, Villanueva offered to testify as follows:

> I was going to testify about three separate issues. The first issue was about patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night. . . . I was also going to testify that the patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also how she makes her life decisions. It influenced her behavior in that— how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process. And lastly, looking at her CPS history, how—and also her social history, how she deals with different people in levels of authority, and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviours [sic] or patterns of behavior or her social history.

ROA.4706–07. Villanueva emphasized that she intended to offer an opinion about what Lucio was thinking during the interrogation and whether Lucio was telling the truth based on Lucio's body language. ROA.4695–96.

---

2003) (en banc) (per curiam); *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 598–600 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

The state trial court found that a social worker was unqualified to testify about body language, unlike, say, "a psychologist . . . that has done studies on that and has [an] academic background on that." ROA.4691. The court therefore concluded that Villanueva was not "an expert on whether or not [Lucio's interrogation] statement was true or not true." ROA.4700. The trial court found Villanueva was "imminently qualified on the issue of mitigation." ROA.4700. But it found she could not hold herself "as an expert as to why that statement is or is not true." ROA.4700.

Ultimately, the defense argued to the jury that, because Lucio admitted that she abused her child, the jury should credit as true her insistence to the police that she did not hit Mariah in the head. ROA.15340–43. The prosecution asked the jury to infer that Lucio dealt the head blow that killed Mariah, just as Lucio had abused the child in other ways. ROA.15354–61.

The jury found Lucio guilty of capital murder. ROA.8093. And it found insufficient mitigating evidence to warrant a life sentence. ROA.8098. The trial court sentenced her to death. ROA.10284.

## B.

Lucio appealed. *See Lucio v. State*, 351 S.W.3d 878 (Tex. Crim. App. 2011). She raised fourteen "points of error" on direct appeal to the Texas Court of Criminal Appeals. *Id.* at 880. Lucio's ninth and tenth points of error are at issue in our decision today.

Points of error nine and ten concerned the exclusion of Villanueva's and Pinkerman's opinions, respectively. *Id.* at 897–902; ROA.10785–86. Lucio argued that the exclusion of those opinions at the guilt phase of her trial violated the Fourteenth Amendment's Due Process Clause as interpreted in *Crane v. Kentucky*, 476 U.S. 683 (1986). With respect to each expert, Lucio argued:

No. 16-70027

> The defendant has a constitutional right to present evidence before the jury as to the circumstances under which his confession is taken. *Crane v. Kentucky*, 746 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)[.] *Crane* deals with circumstances like how many policemen were there, how big the room was, how long the questioning lasted, etc. But the principle has wider application. The reason the jury [was] entitled to know about the circumstances under which the statement was given [was] so that they could assess the voluntariness of the statement and so that they could use evidence of circumstances and their conclusion on voluntariness to follow the judge's instructions to disregard the statement unless they were convinced beyond a reasonable doubt that the statement was voluntary.

ROA.10841; ROA.10844–45 (same). Lucio insisted that both Villanueva and Pinkerman would have offered "critical evidence" that was "so important" that its erroneous exclusion meant Lucio deserved a new trial. ROA.10841; ROA.10844 (same).

The Court of Criminal Appeals found Lucio's arguments on both points unavailing. *See Lucio*, 351 S.W.3d at 897–902 (overruling points of error nine and ten). As to point nine (concerning Villanueva), the court noted that Villanueva testified at the admissibility hearing that she would give opinions about the truthfulness of Lucio's videotaped statements based on her knowledge of body language. *Id.* at 899–900. But on appeal, counsel claimed she would have given an opinion on whether Lucio suffered from battered woman syndrome. *Ibid.* Noting the inconsistency, the court held that she "failed to preserve the claim that she raises on appeal." *Id.* at 900.

But even if Lucio had preserved point of error nine, the Court of Criminal Appeals held, it would not matter. The court first observed that Villanueva's "*testimony that was actually proffered* had little, if any, relevance" to the question of voluntariness. *Ibid.* (emphasis added). That was

8

so even under Texas law, which offered broader protections than the federal constitution. *See ibid.* (citing *Oursbourn v. State*, 259 S.W.3d 159, 172–73 (Tex. Crim. App. 2008)); *see also Oursbourn*, 259 S.W.3d at 173 (explaining that Texas's statutory protections against "involuntary" confessions are "broader in scope than those covered by the Due Process Clause or *Miranda*"). Furthermore, under the Texas Rules of Evidence, Villanueva could not "testify that [Lucio] may have been telling the truth when she initially denied abusing Mariah." *Lucio*, 351 S.W.3d at 901 n.25 (quoting *Yount v. State*, 872 S.W.2d 706, 708–09 (Tex. Crim. App. 1993) (en banc), for the proposition that an expert's "direct testimony as to a witnesses' [sic] credibility is inadmissible under [TEX. R. EVID.] 702 because it does not concern a subject upon which the testimony of an expert would *assist* the trier of fact" (emphasis in original)). The court also held that any error was harmless. *See id.* at 901 & n.25.[4]

As to point of error ten (concerning Pinkerman), the Court of Criminal Appeals found similar problems. Appellate counsel argued Pinkerman would've testified "that since [Lucio] was an abused woman she would agree with anything a policeman would say." *Id.* at 901 (quotation omitted). But the court observed that was not what Pinkerman had offered at trial. Instead, at trial, Pinkerman made a "broad and general" offer of proof

---

[4] The Court of Criminal Appeals noted that testimony about body language might have countered some statements by Officer Escalon, who interrogated Lucio and commented on her demeanor. But Lucio's "subsequent admission during her recorded statement that she abused Mariah, followed by her demonstrating such abuse with the doll" rendered any error on that point harmless. *Lucio*, 351 S.W.3d at 901 n.25. Additionally, that wasn't Lucio's only admission. As the Court of Criminal Appeals noted elsewhere, the jury could have "reasonably infer[red] that [Lucio] was referring to Mariah's fatal injuries when she told her sister during their cell-phone conversation that she 'did it.'" *Id.* at 895. And that statement did not occur during a custodial interrogation, could not have been motivated by a battered woman's willingness to tell male police officers what they wanted to hear, and had nothing to do with body language.

that referred to Lucio's "psychological functioning" and "demeanor." *Id.* at 902 n.26 (quotation omitted). The court concluded that because of this variance between the offer of proof at trial and Lucio's argument on appeal, Lucio did not preserve her appellate argument concerning Pinkerman. *Id.* at 902.

But even if Lucio had preserved the point, the Court of Criminal Appeals held, it would not matter. That was because, in the court's view, "Pinkerman's proffered guilt-phase testimony had little, if any, relevance" to the voluntariness of Lucio's interrogation statements. *Ibid.* (citing *Oursbourn*, 259 S.W.3d at 172–73). The court also held the exclusion of Pinkerman's opinion was harmless in any event. *Ibid.*

The Court of Criminal Appeals overruled the rest of Lucio's points of error and affirmed the judgment of the trial court. *Id.* at 910. Lucio petitioned the U.S. Supreme Court for a writ of certiorari; the Court denied it. *Lucio v. Texas*, 566 U.S. 1036 (2012) (mem.).

## C.

Next, Lucio applied for state postconviction relief. For present purposes, the most important part of her state habeas application is issue four.

She framed that part of her state habeas application in this way: "ISSUE FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial." ROA.8029. In issue four, Lucio again argued that the trial court erred by excluding the opinions of Villanueva and Pinkerman during the guilt phase of her trial. ROA.8029–34. Lucio took pains to distinguish this claim from her prior claims made during her direct appeal. In a footnote at the start of her discussion of issue four, Lucio said:

> Counsel distinguishes the claim raised in the instant proceeding from the claim raised on direct appeal that the trial court abused its discretion by preventing Melissa from presenting evidence regarding the circumstances under which her confession was taken. *See* Direct Appeal Brief (citing *Crane v. Kentucky*, 476 U.S. 683, 106 S.[]Ct. 2142, 90 L.[]Ed.[]2d 636 (1986)). The instant issue goes to the core of the case— whether Melissa was likely to have engaged in ongoing abuse of Mariah.

ROA.8029 n.36.

After disclaiming reliance on *Crane*, Lucio noted that "a criminal defendant's constitutional right to present a complete defense is violated by the exclusion of evidence pursuant to a state evidentiary rule that categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense." ROA.8029. Lucio's application went on to note that Texas's relevance rule itself is constitutional because it "serves a legitimate interest and does not unconstitutionally abridge the right to present a defense." ROA.8032. But, Lucio argued, "the evidence at issue here was not irrelevant to the issue of Melissa's guilt or innocence." ROA.8032. Because the proffered testimony of Villanueva and Pinkerman "was relevant to attack the credibility of the State's case," Lucio argued, "the jury was unable to make an informed decision regarding the weight to be given the State's evidence of ongoing abuse" without their opinions. ROA.8033–34. On that account, "the trial court violated Melissa's right to present a complete defense when it disallowed her expert's [sic] testimony during guilt/innocence as irrelevant." ROA.8034.

In other grounds of her state habeas application, Lucio also argued her trial counsel provided ineffective assistance of counsel ("IAC"). For example, she argued that trial counsel provided IAC by failing "to file a pre-trial motion to suppress [her] custodial statements." ROA.7970 ("Issue

Two"). She also argued that trial counsel "failed to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist." ROA.7988 ("Issue Three"). To support these IAC claims, Lucio offered a post-trial affidavit from Pinkerman. ROA.8975. In that affidavit, Pinkerman testified that Lucio's "psychological characteristics increase the likelihood that she would acquiesce while providing her confession" during her custodial interrogation. ROA.8975. Pinkerman stated that Lucio's statements to police "could have been accounted for by her dependent and acquiescent personality," along with her history of "emotional[ly] and physically abusive relationships with males." ROA.8975–76. Pinkerman faulted trial counsel for failing to ask the court if he could offer opinions on these matters: "During meetings with defense counsel I raised questions about these issues. To my knowledge these issues were never raised at the pretrial [sic] or trial." ROA.8975. Pinkerman's IAC affidavit did not purport to offer any opinion on why Lucio might accept blame when talking on the phone to her sister about what happened to Mariah.

The state habeas court rejected all of Lucio's claims, including her complete-defense claim in issue four. ROA.10083–96. The state habeas court explained its analysis of issue four in two paragraphs:

> 39. [Lucio's] complaint about this Court's exclusion of her mitigation experts [Villanueva and Pinkerman] from the guilt-innocence portion of the trial is nearly identical to issues nine and ten raised on direct appeal. Matters raised on direct appeal should not be re-litigated on habeas unless the judgment is subsequently rendered void or a subsequent change in the law is made retroactive. While additional evidence may warrant relief even when the issue was raised on direct appeal, Applicant has not demonstrated that she is entitled to relief herein because of any additional evidence herein.

No. 16-70027

40. Moreover, this Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman from the guilt-innocence portion of the trial. Ms. Villanueva proffered nothing to indicate that she had any sort of specialized experience, knowledge or training in the area of interpreting body language and patterns of behavior during police interviews. Dr. Pinkerman's proffered testimony as to [Lucio's] psychological functioning, including how there was little support in the "historical record" for the idea that [Lucio] physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning had no relevance to the question of [Lucio's] guilt or innocence.

ROA.10091.

Lucio filed objections to the state habeas court's findings of fact and conclusions of law. ROA.5866–93. In those objections, Lucio recognized that her complete-defense claim in state habeas was "nearly identical" to the one she made on direct appeal—but "'[n]early identical' is not 'identical.'" ROA.5884. She emphasized that her state habeas application—unlike her direct appeal—did not challenge the circumstances of her custodial interrogation or the exclusion of her experts under *Crane*. ROA.5884. And Lucio's objections did not say that Pinkerman's post-trial affidavit— submitted to buttress her IAC claims—had any relevance whatsoever to her complete-defense claim. ROA.5883–84. The Court of Criminal Appeals adopted the lower court's decision and denied relief. ROA.7768–69.

D.

Lucio then petitioned for habeas relief in federal court. *See* 28 U.S.C. § 2254. She raised 25 claims for relief, including a complete-defense claim. *See Lucio v. Davis*, No. 13-cv-125, 2016 U.S. Dist. LEXIS 195659, at *31 (S.D. Tex. Sept. 28, 2016). The district court wrote a thorough 65-page opinion

that analyzed all 25 claims. As to the complete-defense claim, the district court held that Lucio "attempt[ed] to dress up [a] state evidence law claim as a constitutional claim" and that her attempt was "without merit." *Id.* at *65–66. The district court denied the petition and denied a Certificate of Appealability ("COA"). *Id.* at *92–94.

Lucio asked for a COA from our court. *Lucio v. Davis*, 783 F. App'x 313 (5th Cir. 2019). We granted one on "the question of whether the exclusion of Lucio's proffered experts on the credibility of her alleged confession violated her constitutional right to present a complete defense." *Id.* at 319 (quotation omitted). Thereafter, a panel of our court determined that Lucio had raised the issue of her right to a complete defense in state court, but that no state court had adjudicated that claim. *Id.* at 314–15. Applying *de novo* review, the panel concluded that the exclusion of Pinkerman's opinion violated Lucio's right to present a complete defense. *Id.* at 325. The panel found *Crane* highly relevant, notwithstanding Lucio's emphatic disclaimer of that authority in her state habeas application. And the panel found Pinkerman's affidavit highly relevant, notwithstanding Pinkerman's concession that none of the material in it had been properly presented to the state trial court on account of alleged deficiencies by trial counsel. The panel reversed the district court's judgment and remanded for the district court to grant habeas relief to Lucio. *Ibid.* Our en banc court vacated the panel decision on rehearing. *Lucio v. Davis*, 947 F.3d 331 (5th Cir. 2020) (mem.).

## II.

Our now-vacated panel decision concluded that Lucio fairly presented a complete-defense claim to the state courts; the state courts simply overlooked it; and Lucio therefore got the benefit of *de novo* review of her complete-defense claim in federal court. That was error. To explain why, we

No. 16-70027

begin with the exhaustion requirement. Then we hold that the state courts adjudicated Lucio's claims as she presented them.

A.

The exhaustion requirement is a cornerstone of federal habeas for state prisoners. The Supreme Court first announced it in *Ex parte Royall*, 117 U.S. 241 (1886), shortly after Congress extended the writ of habeas corpus *ad subjiciendum* to prisoners in state custody. Then, in 1948, Congress codified the exhaustion requirement in 28 U.S.C. § 2254. Today the statute provides that Lucio's federal habeas application "shall not be granted" unless she has exhausted available remedies in the state courts. *Id.* § 2254(b)(1).

"[T]he exhaustion doctrine is designed to give the state courts a *full and fair opportunity* to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (emphasis added). It's premised on comity and federalism: Because state courts are obligated to enforce federal law, they must be given the first chance—after the state prisoner fully explains the federal claim—to correct any error. *See id.* at 844. "This rule of comity reduces friction between the state and federal court systems by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *Id.* at 845 (quotation omitted).

Obviously, it would undermine or eliminate the exhaustion requirement if a state prisoner could change the claim along the way from state court to federal court. As the Supreme Court has explained:

> We emphasize that the federal claim must be fairly presented to the state courts. If the exhaustion doctrine is to prevent unnecessary conflict between courts equally bound to guard

No. 16-70027

and protect rights secured by the Constitution, it is not sufficient merely that the federal habeas applicant has been through the state courts. The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the *same claim* he urges upon the federal courts.

*Picard v. Connor*, 404 U.S. 270, 275–76 (1971) (emphasis added) (quotation omitted).

Consider, for example, *Duncan v. Henry*, 513 U.S. 364 (1995) (per curiam). In that case, a California jury convicted Henry of sexually molesting a five-year-old. At trial, Henry objected to the introduction of testimony by the parent of another child he allegedly molested 20 years earlier. In the state courts, Henry framed his objection in terms of California evidentiary law. But in the federal courts, Henry argued the erroneous introduction of the testimony violated the Due Process Clause. The Ninth Circuit held that Henry exhausted his state remedies because he gave the state courts "the operative facts" and "the substance of his federal claim." *Henry v. Estelle*, 33 F.3d 1037, 1040–41 (9th Cir. 1993) (quotation omitted).

The Supreme Court summarily reversed. It held the California courts "understandably" decided Henry's claim in the terms he presented it. *Henry*, 513 U.S. at 366. And in presenting his claim to the state courts, Henry did not claim the introduction of the challenged testimony violated the Due Process Clause—even if he presented the "facts" and "substance" of the claim in other terms. *Ibid.* "The failure [was] especially pronounced in that [Henry] did specifically raise a due process objection before the state court based on a different claim . . . ." *Ibid.* Therefore, the exhaustion requirement

16

provides that a state prisoner who does not fairly present a claim to a state habeas court—specifying both the legal and factual basis for the claim—may not raise that claim in a subsequent federal proceeding.

## B.

For each claim that Lucio fully and fairly presented to the state courts, there's a rebuttable presumption that the state courts adjudicated it on the merits. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013). It's possible that Lucio did her part by presenting her claims fully and fairly, and that the state courts nonetheless erred and overlooked them. But *Williams* holds such a scenario is unlikely. *See id.* at 300–01 ("[I]t is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked"). Therefore, "a federal habeas court must presume that the federal claim was adjudicated on the merits." *Id.* at 301.

For each claim that the state court adjudicated on the merits, AEDPA's relitigation bar applies. *See* 28 U.S.C. § 2254(d) (generally barring relitigation of claims that are "adjudicated on the merits" in state court); *see also ibid.* (specifying that the relitigation bar applies on a "claim"-by-"claim" basis). And Lucio can overcome the relitigation bar only by proving that

> (1) the state court's "decision" on her claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1); or

> (2) the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

For each claim governed by AEDPA's relitigation bar, we must identify the relevant state-court "decision." *Id.* § 2254(d)(1)–(2). To that

end, the Supreme Court says that we must "train [our] attention" on the "last related state-court decision" that provides a "relevant rationale" to a particular claim. *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (quotation omitted). Only then can we consider whether the state court's "decision" was contrary to or an unreasonable application of clearly established Supreme Court precedent. *Id.* at 1192; *see also, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) ("To decide the present case, therefore, we begin by asking which is the last explained state-court judgment on the [federal] claim." (emphasis omitted)); *Premo v. Moore*, 562 U.S. 115, 123–33 (2011); *Sears v. Upton*, 561 U.S. 945, 951–56 (2010) (per curiam).

## C.

In Lucio's case, as in *Henry*, the state courts adjudicated the claims in the same terms as the prisoner presented them. And, as in *Henry*, Lucio's claims shifted over time. That means, over the course of this litigation, different state courts adjudicated different claims. We walk through each relevant decision in turn.

At trial, Lucio urged that expert-opinion testimony from Villanueva and Pinkerman should be admitted under the Texas Rules of Evidence. The trial court excluded Villanueva because she was not qualified to offer an expert opinion about Lucio's psychology, body language, or credibility. *See* Tex. R. Evid. 702 (providing the state-law standard for *Daubert* challenges); *Yount*, 872 S.W.2d at 708–09. And the trial court excluded Pinkerman's opinion about Lucio's "psychological functioning" as irrelevant to her guilt and as relevant only to mitigation. *See* Tex. R. Evid. 402. At no point did trial counsel suggest that the exclusion of either witness would violate Lucio's rights under the federal Due Process Clause. *See Henry*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law

guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). And at no point did either expert offer to testify about the circumstances of Lucio's custodial interrogation and whether she felt psychological pressure to admit to abusing Mariah. As Pinkerman himself later said, "To my knowledge these issues were never raised at the pretrial [sic] or trial." ROA.8975.

On direct appeal, Lucio changed her claim and argued that, under the Due Process Clause and *Crane v. Kentucky*, Lucio had the right to present Villanueva and Pinkerman to challenge the "voluntariness" of her custodial statements. Even though Lucio defaulted this claim by failing to present it to the trial court, the Court of Criminal Appeals adjudicated it anyway. And the court held Lucio's voluntariness challenges failed because the testimony that Lucio's experts had actually proffered at trial had "little, if any, relevance" to the issue of voluntariness. *Lucio*, 351 S.W.3d at 901 (Villanueva), 902 (Pinkerman). And again, that was so even though Texas law requires the admission of more evidence than the minimum required by the Federal Constitution. *See id.* at 900 (quoting *Oursbourn*, 259 S.W.3d at 172–73, for various examples of "fact scenarios that can raise a state-law claim of involuntariness (*even though they do not raise a federal constitutional claim*)" (emphasis added)). Thus, the Court of Criminal Appeals adjudicated and denied Lucio's *Crane* claim on direct appeal. *See Williams*, 568 U.S. at 301 ("[I]f the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits."); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

On state habeas, Lucio changed the claim again. This time, she expressly disclaimed *any reliance* on *Crane* and insisted that she did not want to challenge the exclusion of "evidence regarding the circumstances under which her confession was taken." ROA.8029 n.36. Rather, she argued that

No. 16-70027

the exclusion of Villanueva and Pinkerman deprived her of the constitutional right to present a complete defense by proving that she was "[un]likely to have engaged in ongoing abuse of Mariah." ROA.8029 & n.36. The state habeas court held that Lucio's claim was procedurally barred insofar as she attempted to re-raise her *Crane* claim regarding the circumstances of her custodial interrogation. ROA.10091. And beyond that, the claim was meritless because Villanueva's proffered body-language testimony failed the Texas *Daubert* standard, and Pinkerman's generalized proffer about Lucio's psychological functioning was relevant to mitigation but "had no relevance to the question of [Lucio's] guilt or innocence." ROA.10091.

Based on the state-court proceedings, two things are clear: (1) Lucio exhausted state remedies regarding two relevant claims in two different state proceedings, and (2) the state courts adjudicated both claims on the merits.[5] On direct appeal, the Court of Criminal Appeals heard and rejected Lucio's claim that *Crane v. Kentucky* gives her the federal due process right to present testimony regarding the circumstances of her custodial interrogation. On state habeas, the state court heard and rejected Lucio's distinct claim that the exclusion of Villanueva and Pinkerman from the guilt phase of her trial prevented her from proving that she was "[un]likely to have engaged in ongoing abuse of Mariah." This is the way Lucio chose to present her claims and hence the way the state courts were required to adjudicate them. The state courts adjudicated both claims on the merits. So AEDPA's relitigation bar applies. *See* 28 U.S.C. § 2254(d).

---

[5] True, the state courts also identified procedural bars to both claims based on Lucio's ever-changing arguments. But it long has been true that a state court's adjudication of a claim on the merits means that the claim is exhausted. *See, e.g.*, *Castille v. Peoples*, 489 U.S. 346, 350 (1989); *Brown v. Allen*, 344 U.S. 443, 447 (1953).

No. 16-70027

### III.

We next evaluate the relevant state-court decisions under AEDPA's relitigation bar, 28 U.S.C. § 2254(d). In enacting that provision, Congress imposed strict limitations on federal courts considering habeas applications from state prisoners. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc), *cert. denied*, 140 S. Ct. 2676 (2020) (mem.); *see also Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020) (per curiam) ("Under AEDPA, state courts play the leading role in assessing challenges to state sentences based on federal law."). "To overcome AEDPA's relitigation bar, a state prisoner must shoehorn [her] claim into one of its narrow exceptions." *Langley*, 926 F.3d at 155; *see* 28 U.S.C. § 2254(d)(1)–(2). The prisoner can do so only if the state court's decision was "so obviously wrong as to be beyond any possibility for fairminded disagreement." *Kayer*, 141 S. Ct. at 526 (quotation omitted).

Lucio says she satisfied AEDPA's relitigation exceptions in three ways. She first argues (A) the state court's decision was "contrary to" or "involved an unreasonable application of" *Crane*. 28 U.S.C. § 2254(d)(1). She next argues (B) the state court's decision was "contrary to" or "involved an unreasonable application of" *Chambers v. Mississippi*, 410 U.S. 284 (1973). 28 U.S.C. § 2254(d)(1). She finally argues (C) the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We consider and reject each argument in turn.

### A.

We start with Lucio's claim under *Crane v. Kentucky*. We first explain the law clearly established in *Crane*. Then we train our attention on the last state-court decision to adjudicate that claim—the state court's decision in

No. 16-70027

Lucio's direct appeal—and evaluate that decision under the relitigation bar. *See Wilson*, 138 S. Ct. at 1192.

1.

The Supreme Court has held that the "Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam) (quoting *Crane*, 476 U.S. at 690). But it has also recognized that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Ibid.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). "Only rarely" has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Ibid.*

In *Crane*, the Supreme Court considered the constitutionality of a novel evidentiary practice that was first recognized by the Kentucky Supreme Court in *Crane* itself. Prior to his murder trial, Crane moved to suppress his confession pursuant to Kentucky Rule of Criminal Procedure 9.78. *Crane v. Kentucky*, 690 S.W.2d 753, 753 (Ky. 1985). That rule, adopted on January 1, 1978, stated:

> Rule 9.78. Confessions and searches—Suppression of evidence.—If at any time before trial a defendant moves to suppress, or during trial makes timely objection to the admission of evidence consisting of (a) a confession or other incriminating statements alleged to have been made by him to police authorities or (b) the fruits of a search, the trial court shall conduct an evidentiary hearing outside the presence of the jury and at the conclusion thereof shall enter into the record findings resolving the essential issues of fact raised by the motion or objection and necessary to support the ruling. If supported by substantial evidence the factual findings of the trial court shall be conclusive.

*Ibid.* The Kentucky trial court conducted a "lengthy hearing and denied the motion to suppress, finding the confession to be voluntary." *Ibid.* Then, at trial, the court refused to allow the introduction of *any* evidence regarding the "circumstances surrounding the taking of the confession." *Id.* at 754. The Kentucky Supreme Court affirmed, holding:

> [O]nce a hearing is conducted pursuant to [Rule 9.78] and a finding is made by the judge based upon substantial evidence that the confession was voluntary, that finding is conclusive and the trial court may exclude evidence relating to voluntariness from consideration by the jury when that evidence has little or no relationship to any other issue.

*Id.* at 755.

The Supreme Court reversed because the Kentucky Supreme Court's decision relied on the "assumption that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." *Crane*, 476 U.S. at 687. That assumption was "directly at odds with language in several [Supreme Court] opinions," and it "conflict[ed] with the decisions of every other state court to have confronted the issue," *ibid.*, as well as 18 U.S.C. § 3501(a) and Federal Rule of Evidence 104(e), *id.* at 689. The Court held "on the facts of this case that the blanket exclusion of the proffered testimony," in "the absence of any valid state justification," was unconstitutional. *Id.* at 690. In making its decision, the Court took pains to note that it was not "question[ing] the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Id.* at 689.

The Supreme Court subsequently reminded us that *Crane* does "*not* set[] forth an absolute entitlement to introduce crucial, relevant evidence"

at a criminal trial. *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (plurality opinion). It explained:

> Our holding that the exclusion of certain evidence in that case violated the defendant's constitutional rights rested not on a theory that all competent, reliable evidence must be admitted, but rather on the ground that the Supreme Court of Kentucky's sole rationale for the exclusion (that the evidence did not relate to the credibility of the confession) was wrong. *Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a valid reason.

*Ibid.* (quotations omitted).

2.

Lucio argues that the state court's exclusion of Villanueva and Pinkerman was "contrary to" the law clearly established in *Crane*. *See* 28 U.S.C. § 2254(d)(1). "A state-court decision is contrary to clearly established federal law only if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Langley*, 926 F.3d at 155 (quotations omitted). For example:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be diametrically different, opposite in character or nature, and mutually opposed to [the Supreme Court's] clearly established precedent because [it] held in *Strickland* that the prisoner need only demonstrate a reasonable probability that the result of the proceeding would have been different.

*Terry Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (quotation omitted).

Lucio cannot meet that high bar here. In answering our en banc questions,[6] Lucio conceded that, at best, her claim is "strongly supported" by *Crane* and that no case is on "all fours" with her claim. Lucio Opening En Banc Q&A 25–26. That is insufficient to show that the state court's decision is "diametrically different" from *Crane*. *See Terry Williams*, 529 U.S. at 405. Therefore, "here, as in most AEDPA cases," the "contrary to" exception does not apply. *Langley*, 926 F.3d at 156.

Next, Lucio argues that the decision by the Court of Criminal Appeals "involved an unreasonable application of" *Crane*. *See* 28 U.S.C. § 2254(d)(1). To meet that exception to the relitigation bar, Lucio must do much more than establish that the state court erred. *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." (quotation omitted)). "Rather, the relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Langley*, 926 F.3d at 156 (quotation omitted); *see also Kayer*, 141 S. Ct. at 520 (summarily reversing the Ninth Circuit for "ordering issuance of a writ of habeas corpus despite ample room for reasonable disagreement about the prisoner's . . . claim").

---

[6] Because of COVID-19, our court did not conduct our usual en banc argument. Instead, we used a multi-round form of written questions and answers. In the first round, we presented written questions—some for both parties, some solely for Lucio or the State. After the parties provided their answers to the court's questions, they both submitted rebuttals to each other's answers. Both parties provided thorough and helpful answers.

We hold the Court of Criminal Appeals did not unreasonably apply *Crane* in Lucio's direct appeal. As an initial matter, we note that the Court of Criminal Appeals held that the two witnesses' opinions were inadmissible under state law, which affords broader protections than the *Crane*-Due Process standard in federal law. *See Lucio*, 351 S.W.3d at 900, 902 (citing TEX. CODE CRIM. PROC. arts. 38.21, 38.22, and *Oursbourn*, 259 S.W.3d at 172–73). Because Texas law is "broader in scope" than the U.S. Constitution on this issue, a determination that a claim fails on state-law grounds necessarily adjudicated any federal claim as well. *See Williams*, 568 U.S. at 298–99 (holding a state-law adjudication necessarily adjudicates the federal question where the former "fully incorporat[es]" the latter). Lucio has never argued that Texas's statutory and decisional standards are in fact narrower than the *Crane* standard. She therefore has forfeited any argument to that effect.

Moreover, we have observed that cases involving *Crane* "typically focus" on evidentiary rules that lead to "categorical prohibitions of certain evidence and not discretionary decisions to exclude evidence under general and otherwise uncontroversial rules." *Caldwell v. Davis*, 757 F. App'x 336, 339 (5th Cir. 2018) (per curiam). As Lucio conceded in her en banc answers, she is not challenging the constitutionality of Texas's evidentiary rules regarding the relevance and the admission of expert-opinion testimony. Lucio Opening En Banc Q&A 24–25. Nor does Lucio allege that the Texas courts categorically prohibited her from undermining her own inculpatory statements. For example, the trial court permitted Lucio's sister to testify about Lucio's background, her tendency to take the blame for things she did not do, and the phone call in which Lucio allegedly said: "This was me. I did

it."[7] Her only complaint is that the trial court made discretionary errors in excluding the particular expert opinions proffered by Villanueva and Pinkerman. Therefore, Lucio fails to show that Texas courts *categorically* prohibited evidence undermining her inculpatory statements.

Lucio cannot argue that the Court of Criminal Appeals unreasonably applied *Crane* by failing to extend it to *discretionary* evidentiary decisions. "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis in original). We, like the Ninth Circuit, are aware of no clearly established law regarding "a court's exercise of discretion to exclude expert testimony" as it relates to a "criminal defendant's constitutional right to present relevant evidence." *Moses v. Payne*, 555 F.3d 742, 758–59 (9th Cir. 2009); *see also Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) ("[T]he Supreme Court has not decided any case either squarely address[ing] the discretionary exclusion of evidence and the right to present a complete

---

[7] Our now-vacated panel opinion made much of the fact that a police officer overheard this statement while listening to only Lucio's side of the conversation with her sister, and that the officer "did not create a log of Lucio's alleged statements until nearly sixteen months after he interacted with Lucio—the month before trial." *Lucio*, 783 F. App'x at 324 n.6. But far from supporting a *Crane* claim, these propositions disprove it. *Crane* guarantees Lucio the procedural opportunity to present her defense. The trial court gave Lucio the procedural opportunity—and her trial counsel vigorously exercised it—to cross-examine the officer about what he overheard Lucio say and the length of time between that conversation and the officer's report. ROA.14992–93. And as noted above, the trial court afforded Lucio the opportunity—which she again vigorously exercised—to present her sister's side of the phone call. All of this proves that the State did not categorically bar Lucio, as in *Crane*, from presenting any evidence to undermine her inculpatory statement.

defense or establish[ing] a controlling legal standard for evaluating such exclusions." (quotation omitted) (alterations in original)).

And it's not just the Ninth Circuit. Many of our sister circuits, reviewing state prisoners' applications under § 2254(d)(1), have upheld state courts' wide latitude to make discretionary evidentiary decisions. *See, e.g.*, *Grant v. Royal*, 886 F.3d 874, 959–60 (10th Cir. 2018) (rejecting state prisoner's habeas application under the relitigation bar because *Crane* did not implicate the "discretionary application of evidentiary rules"); *Troy v. Sec'y, Fla. Dep't of Corr.*, 763 F.3d 1305, 1307, 1315 (11th Cir. 2014) (rejecting state prisoner's habeas application under the relitigation bar because *Crane* does not deprive state courts of the "gatekeeping role" to make discretionary evidentiary decisions); *Gagne v. Booker*, 680 F.3d 493, 516 (6th Cir. 2012) (en banc) (rejecting state prisoner's habeas application under the relitigation bar because, consistent with *Crane*, "a trial court may even exclude competent reliable evidence . . . central to the defendant's claim of innocence, so long as there exists a valid state justification" (quotation omitted)); *Rucker v. Norris*, 563 F.3d 766, 770 (8th Cir. 2009) (rejecting state prisoner's habeas application under the relitigation bar because "*Crane* proscribed only the 'wholesale exclusion' of evidence pertaining to the credibility of a confession").

Take for example the Sixth Circuit's decision in *Loza v. Mitchell*, 766 F.3d 466 (6th Cir. 2014). It assessed an Ohio court's exclusion of a clinical psychologist that the defendant sought to use "to help explain his confession." *Id.* at 481. The Sixth Circuit held the prisoner could not surmount the relitigation bar because the state court did not apply a "mechanistic, *per se*" rule but instead made an "individual determination" about the appropriateness of the testimony based on the specific facts of the case. *Id.* at 485 (quotations omitted). Importantly, the defendant was given the opportunity to present "other evidence bearing on the credibility of his

confession." *Ibid*. And the jury had the opportunity to watch the video of the defendant's confession to see for itself the "tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation." *Ibid*. (quotation omitted). Although more evidence like the clinical psychologist's opinion would have been helpful, the Sixth Circuit found it reasonable to "conclude[] that *Crane* did not *require* this evidence to be admitted." *Id*. at 486 (emphasis in original).

We refuse to create a circuit split. As previously discussed, the Court of Criminal Appeals did not affirm any "blanket exclusion" of evidence regarding Lucio's confession. Instead, it considered her two proffered experts on an individualized basis and found their opinions to be inadmissible as a matter of state law. The jury hearing Lucio's case had ample opportunity to assess the credibility of her various statements—it could watch the video of the interrogation, it could listen to her sister's testimony, and it could compare that testimony with the police officer's. Thus, even if we assume *arguendo* that a discretionary evidentiary ruling could violate *Crane*, Lucio has not proven beyond any fair-minded disagreement that the state court's decision on her direct-appeal record rises to that level. Accordingly, the Court of Criminal Appeals' decision was not an unreasonable application of the clearly established federal law in *Crane*.

Nor does the state court's decision become unreasonable, as Lucio argues, because of Pinkerman's post-trial, collateral-review affidavit. The Supreme Court has strictly instructed that our review is "limited to the record that was before the state court *that adjudicated the claim on the merits*." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (emphasis added). To that end, "the record under review is limited to the record in existence at that same time." *Id*. at 182. Since the Pinkerman affidavit did not exist at the time the Court of Criminal Appeals evaluated Lucio's *Crane* claim on direct appeal,

the record before that court didn't include the affidavit. Therefore, we may not consider the affidavit in reviewing that court's direct appeal decision.

## B.

We next consider the complete-defense claim that Lucio exhausted in her state habeas application. We first identify the claim. Then we describe the clearly established law as articulated by the Supreme Court. Then we evaluate the relevant state-court decision under AEDPA's relitigation bar.

## 1.

Lucio adamantly insisted that her state habeas claim did not involve *Crane*. ROA.8029 n.36. She presumably did so to avoid the state procedural bar on re-raising claims in state habeas after raising them on direct appeal. *See, e.g.*, *Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006) ("[H]abeas relief is not available to one who has already litigated his claim at trial, in post-trial motions, or on direct appeal."). So we take Lucio at her word that the state habeas claim does not implicate *Crane*.

We also assume that Lucio does not intend to challenge the state courts' application of state-law evidentiary rules. It's well-settled that such state-law challenges form "no part of a federal court's habeas review of a state conviction. We have stated many times that federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quotation omitted). And that obviates much of Lucio's state habeas claim. The three principal cases cited in that application all involve direct appeals of mine-run evidentiary challenges. *See* ROA.8032–33 (citing *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007), and an unpublished, intermediate state-court decision in *Kaps v. State*, No. 05-97-00328-CR, 1998 WL 209060 (Tex. App.—Dallas Apr. 30, 1998, no pet.)). These precedents illustrate that state-law evidentiary claims are cognizable on direct appeal. But they are not cognizable in federal habeas.

*See McGuire*, 502 U.S. at 67. So we do not construe Lucio's claim to implicate the state courts' application of state evidence law. *See Lucio*, 2016 U.S. Dist. LEXIS 195659, at *65 ("Lucio's attempt to dress up this state evidence law claim as a constitutional claim is unconvincing.").

What remains unclear is what Lucio's state habeas claim *does* implicate. Our now-vacated panel decision in this case said that "Lucio's argument to the state habeas court flagged her 'complete defense' argument as a 'constitutional' issue and cited a Texas case that relied exclusively on the Federal Constitution." *Lucio*, 783 F. App'x at 319 (citing *Wiley v. State*, 74 S.W.3d 399, 405–07 (Tex. Crim. App. 2002), and *Wiley v. State*, No. 03-99-00047-CR, 2000 WL 1124975, at *1 (Tex. App.—Austin Aug. 10, 2000), *aff'd*, 74 S.W.3d 399 (Tex. 2002)). We disagree that "flagging" a state-court case that in turn cites the U.S. Constitution is sufficient to exhaust a federal claim under 28 U.S.C. § 2254(b)(1). *See, e.g.*, *Williams*, 568 U.S. at 299 (holding "a fleeting reference to a provision of the Federal Constitution or federal precedent" is insufficient to exhaust a federal claim because "a state court may not regard [it] as sufficient to raise a separate federal claim"). And *Wiley* itself did not purport to apply *Crane*, *Chambers*, or any U.S. Supreme Court precedent whatsoever.

The most charitable interpretation of Lucio's state habeas claim is that the exclusion of expert-opinion testimony from Villanueva and Pinkerman infringed her constitutional right to present a complete defense because it precluded Lucio from presenting evidence "regarding the weight to be given the State's evidence of ongoing abuse," ROA.8034, depriving her of the opportunity to prove that she was "[un]likely to have engaged in ongoing abuse of Mariah," ROA.8029 n.36. This claim does not attack the circumstances of Lucio's custodial interrogation as in *Crane*. Rather, Lucio's objection is that the exclusion of the experts' opinions made her trial unfair because it precluded her from proving that she did not beat her child to death

or commit ongoing abuse of Mariah, even though she admitted to committing abuse. And the state habeas court's contrary conclusion, she says, is contrary to or an unreasonable application of *Chambers v. Mississippi*.

2.

Again, we explain the Supreme Court's decision in *Chambers* before considering whether the state court acted contrary to or unreasonably applied that precedent.

The State prosecuted Leon Chambers for murdering a police officer "in the small town of Woodville in southern Mississippi" in 1969. *Chambers*, 410 U.S. at 285. Another man, named McDonald, confessed in a sworn written statement to murdering the police officer. *Id.* at 287. Still, Mississippi brought charges against Chambers, not McDonald. At trial, Chambers called McDonald to the stand and entered McDonald's written confession into evidence. *Id.* at 291. On cross-examination, the State elicited testimony from McDonald repudiating the confession. *Ibid.* After the State's cross-examination, Chambers moved to examine McDonald as a hostile witness. *Ibid.* But the state court denied his request based on an idiosyncratic state-law rule called the "voucher rule"—which prevented Chambers from impeaching his own witness on the theory that "a party who calls a witness 'vouches for his credibility.'" *Id.* at 295 (quoting *Clark v. Lansford*, 191 So.2d 123, 125 (Miss. 1966)).

The Supreme Court noted that the voucher rule has been "condemned as archaic, irrational, and potentially destructive of the truth-gathering process." *Id.* at 296 n.8. And it emphasized that Mississippi did not even attempt "to defend the [voucher] rule or explain its underlying rationale." *Id.* at 297. The Supreme Court therefore held that the "voucher rule" violated Chambers's rights to confront and cross-examine witnesses like McDonald.

The state habeas court's adjudication of Lucio's complete-defense claim is not "contrary to" *Chambers*. 28 U.S.C. § 2254(d)(1). During our en banc Q&A, Lucio recognized that the trial court excluded Villanueva and Pinkerman pursuant to ordinary rules of evidence concerning the admissibility of expert opinions—not pursuant to some idiosyncratic, arbitrary, archaic, and indefensible rule that prohibited her from impeaching her own witness. This significant distinction is far more than sufficient to bar a "contrary to" claim.

Nor is the state habeas court's decision an "unreasonable application" of *Chambers*. *Ibid.* The Supreme Court has instructed us that *Chambers*—like its other complete-defense cases—involved an idiosyncratic state rule of evidence that was "arbitrary," "did not rationally serve any discernible purpose," and "could not be rationally defended." *Jackson*, 569 U.S. at 509 (discussing *Holmes*, 547 U.S. at 331; *Rock v. Arkansas*, 483 U.S. 44, 61 (1987); *Chambers*, 410 U.S. at 302–303; and *Washington v. Texas*, 388 U.S. 14, 22 (1967)). The Supreme Court has never applied its complete-defense cases to discretionary evidentiary decisions under rules that are themselves constitutional, like the rules of evidence involving the admissibility of expert opinions here. Thus, to hold that the state habeas court unreasonably applied these cases, we'd have to (1) extend them or (2) frame them "at such a high level of generality" that we'd "transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" *Id.* at 512 (quoting 28 U.S.C. § 2254(d)(1)). The relitigation bar precludes that.

3.

Our panel decision in this case reached the contrary result by taking the facts from Lucio's state habeas application, mixing them with the law from her direct appeal, and using the resulting combination to condemn the

evidentiary decision made at trial. Specifically, the panel combined the facts in the Pinkerman affidavit (from state habeas) with the *Crane* claim (from direct appeal) to hold the exclusion of Pinkerman's proffer (at trial) was arbitrary and "complete[ly] irrational[]." *Lucio*, 783 F. App'x at 323. The panel held that *Crane* gave Lucio the constitutional right to "take[] away" or "undermine[]" her custodial-interrogation statements; that without those statements, "the State's case [would have been] much more tenuous"; and that "Pinkerman's opinion was that Lucio was susceptible to taking blame for something that was not her fault and that this behavior was manifested in the interrogation video," thereby "cast[ing] doubt on the State's key evidence." *Ibid.*

AEDPA prohibits whipsawing the state courts in this way. *See* 28 U.S.C. § 2254(d); *cf. Wainwright v. Sykes*, 433 U.S. 72, 89 (1977) (rejecting habeas-by-"sandbagging"). This is the entirety of what Pinkerman proffered at trial:

> On the basis of my review of information, consultation with additional experts, and the evaluation that I have done with the defendant Mrs. Lucio, I was going to testify about the characteristics and makeup of her psychological functioning. I was also going to address how her demeanor, both immediately after the incident and during the interrogation, may be understood by understanding and appreciating the psychological elements and previous history and background that she has lived through. I was also going to address the notion of how difficult it might have been for her to step into some of the treatment, even though it was minimally offered. And those are the highlights.

ROA.15301. As the state courts concluded, this proffer provides zero information about what facts or opinions Pinkerman was prepared to offer. It certainly did *not* say—as our panel decision concluded—"that Lucio was

susceptible to taking blame for something that was not her fault and that this behavior was manifested in the interrogation video." *Lucio*, 783 F. App'x at 323. To the contrary, Pinkerman provided no basis upon which the state courts could have concluded that his testimony would have assisted the jury in understanding why Lucio made the statements that she did, why her demeanor was what it was, or whether she murdered her child. If AEDPA's anti-sandbagging rules mean anything, they mean that Lucio and Pinkerman cannot hold back the substance of the proffered testimony with the hope of using it as a trump card later.

The whipsawing embraced by our panel decision is particularly striking because we do not need to guess what Pinkerman would've said if he'd been allowed to testify in the guilt phase of the trial. That's because two days before he was first called to testify and make his proffer, he authored an expert report that detailed his testimony. ROA.15301 (Pinkerman's guilt-phase proffer, dated July 7, 2008); ROA.5387 (Pinkerman's expert report, dated July 5, 2008). The expert report contained extensive psychological evaluations of Lucio. It also described Pinkerman's findings from watching the interrogation video—including that Lucio had a "constrained" demeanor, a "flat" affect, and that "she tunes out to the male investigator." ROA.5394. The report recounted Lucio's custodial statement: "Several hours after Mariah's death, [Lucio] said: '*I'm responsible for it*.'" ROA.5395 (emphasis added). And it recounted Lucio's various other inculpatory admissions of abuse against her daughter. *E.g.*, ROA.5395 (recounting Lucio's admissions that she got "frustrated" with Mariah, "spanked" her, and "When I saw the bruises, I hated myself for what I did."). At no point did Pinkerman's report come close even to hinting that any of these statements were false. At no point did Pinkerman's report come close even to hinting "that Lucio was susceptible to taking blame for something that was not her fault and that this behavior was manifested in the interrogation

No. 16-70027

video." *Lucio*, 783 F. App'x at 323. And at no point did Pinkerman's report say anything at all about battered woman syndrome.

We also don't have to guess about what Pinkerman would have said at trial because he was allowed to testify during the punishment phase. Defense counsel asked Pinkerman multiple questions about Lucio's interrogation video to elicit testimony about the circumstances of the offense and Lucio's moral culpability. *E.g.*, ROA.5131–34; *see* TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1) (requiring the punishment-phase jury to consider, *inter alia*, "the circumstances of the offense" and "the personal moral culpability of the defendant"). And again, Pinkerman did not come close even to suggesting "that Lucio was susceptible to taking blame for something that was not her fault and that this behavior was manifested in the interrogation video." *Lucio*, 783 F. App'x at 323. In fact, Pinkerman repeatedly equivocated regarding battered woman syndrome:

> Q.   Well, do you feel that this defendant has battered woman's syndrome?
>
> A.   I can't answer, yes or no.
>
> Q.   Why not?
>
> A.   Because my answer would be in the middle.

ROA.5169. When pressed to explain the equivocation, Pinkerman stated that "[b]attered woman syndrome isn't a DSM-4 diagnosis." ROA.5170.

Pinkerman radically shifted his story in the state habeas proceeding. That's the first *and only* time he offered any opinion about the circumstances of Lucio's custodial interrogation or battered woman syndrome. And he did it in a state habeas application that said Lucio was *not* challenging the circumstances of her custodial interrogation or the voluntariness of anything she said during that interrogation. The state courts are entitled to adjudicate

the claim that Lucio brought at the time she brought it and in the way she brought it. *See Henry*, 513 U.S. at 366. And we cannot agree with the panel that the state trial court's decision to exclude the proffered testimony was "complete[ly] irrational[]," *Lucio*, 783 F. App'x at 323; *cf. Jackson*, 569 U.S. at 509, based on an affidavit that wasn't even written until many years after the trial and was first presented in a state habeas application that disclaimed the panel's legal theory, *see Pinholster*, 563 U.S. at 181 ("[T]he scope of the record for a § 2254(d)(1) inquiry . . . . is limited to the record that was before the state court that adjudicated the claim on the merits.").

Villanueva fares no better. As Lucio conceded in her opening en banc brief, all of Villanueva's testimony was premised on her comparison of Lucio's body language in pictures that predated the murder to her body language after it. And the state courts had ample reasons under the Texas *Daubert* standard to exclude such guilt-phase testimony based on Villanueva's concession that she had no specialized training, no certification, and no generally accepted science to support interpreting Lucio's body language. ROA.4694–95. In fact, when Villanueva testified at the punishment phase, she conceded that she "was retained to do mitigation. . . . I was not instructed *at all* to make judgments about the innocence or guilt, sir." ROA.5057 (emphasis added). Moreover, even if Villanueva were a qualified body-language expert and were retained to render opinions about Lucio's guilt, the Texas Rules of Evidence would bar her from offering an opinion on Lucio's credibility. *See Yount*, 872 S.W.2d at 708–09. It was therefore reasonable for the state courts to exclude Villanueva from the guilt phase of the trial. Even our now-vacated panel decision did not find error in that result. *See Lucio*, 783 F. App'x at 321.[8]

---

[8] Our panel decision noted "the exclusion of Villanueva's testimony raises concerns about the fairness of the trial" because Officer Escalon testified about Lucio's

No. 16-70027

## C.

Finally, Lucio argues that the state habeas court's decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Because Lucio is challenging a state conviction, "a determination of a factual issue made by a State court shall be presumed to be correct." *Id.* § 2254(e)(1). Furthermore, the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Ibid.* Thus, while the "general standard" for evaluating a state court's findings of fact is reasonableness, § 2254(e)(1) requires a state prisoner to show that the state court's specific factual determination in her case is unreasonable by clear and convincing evidence. *Valdez v. Cockrell*, 274 F.3d 941, 951 n.17 (5th Cir. 2001); *see also Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011). We cannot reject a factual finding merely because we would have made a different one. *See Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013).

---

body language during the interrogation. *Lucio*, 783 F. App'x at 321 n.1. That's apples and oranges. Officer Escalon did not purport to offer an expert opinion; he was describing his personal experiences and impressions while interrogating Lucio. *See Osbourn v. State*, 92 S.W.3d 531, 538–39 (Tex. Crim. App. 2002) (explaining that a police officer's "lay opinion about something she personally perceived," even when informed by an officer's training and experience, is distinct from expert testimony). And to the extent Escalon purported to offer *inadmissible* expert opinion, Lucio's trial lawyers had every right to object. They did not. *See* ROA.4410-11; *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003) (explaining that "to preserve error, an objection must be timely, specific, pursued to an adverse ruling, and, with two [inapplicable] exceptions, contemporaneous—that is, made each time inadmissible evidence is offered"). They also had every right to cross-examine Escalon on the point. Again, they did not. And even if Lucio's counsel allowed inadmissible evidence to come in by failing to object, that would do nothing to qualify Villanueva as an expert on body language under Texas's *Daubert* standard. *See* ROA.4700.

Lucio argues that the state habeas court made an unreasonable factual determination concerning the admissibility of Pinkerman's opinion. The state habeas court held that Pinkerman's proffered opinion "had no relevance to the question of [Lucio's] guilt or innocence." ROA.10091. Lucio argues that this was error—either under Texas Rule of Evidence 402 or "Texas relevance law" generally. But it is well established that a "federal court lacks authority to rule that a state court incorrectly interpreted its own law." *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011); *see McGuire*, 502 U.S. at 67. It is "not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law." *Schaetzle v. Cockrell*, 343 F.3d 440, 449 (5th Cir. 2003) (quoting *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995)). Because Lucio fails to identify any *factual* problems with the state habeas court's decision concerning Pinkerman's opinion, she has failed to make a claim that's cognizable in federal habeas, much less one that can push aside the relitigation bar in § 2254(d)(2). To the extent Lucio's argument can be construed as raising a *legal* claim under federal law, we have already rejected it for the reasons discussed in Parts III.A and III.B.

Our panel decision in this case relied heavily on the affidavit that Pinkerman submitted to the state habeas court. But the whole point of that affidavit was to aver facts that Pinkerman discussed with Lucio's trial counsel and that trial counsel *failed to proffer at trial*. Recall that at trial, Pinkerman did not offer to prove that Lucio made false statements. *See supra* at 5 & n.2. Instead, he made a vague offer to prove "how her demeanor . . . may be understood by understanding and appreciating the psychological elements and previous history and background that she has lived through." ROA.15301. It's precisely because trial counsel did not solicit a better proffer that Pinkerman accused him of ineffective assistance. Thus, according to the Pinkerman affidavit, the *trial court* did not violate her constitutional rights—

her *trial counsel* did. Lucio cannot now fault the state courts for failing to adjudicate a complete-defense claim based on facts that the defense team failed to present.

As for Villanueva, Lucio argues that the state habeas court unreasonably determined that she "proffered nothing to indicate that she had any sort of specialized experience, knowledge[,] or training in the areas of interpreting body language and patterns of behavior during police interviews." ROA.10091. In her expert-admissibility hearing, Villanueva testified on direct examination that she had a master's degree in social work and was licensed to diagnose and treat mental disorders. ROA.4692. On cross-examination, she was asked to identify "one treatise or one book" on the "specialty" of "detect[ing] human thought process through physical conduct." ROA.4694–95. Villanueva conceded, "I'm not a specialist in that area." ROA.4695. Villanueva's testimony provided a reasonable basis for the state habeas court to find that she lacked special expertise in "interpreting body language and patterns of behavior" in the specific context of "police interviews." *Cf. Yount*, 872 S.W.2d at 710 ("Psychologists and psychiatrists are not, and do not claim to be, experts at discerning truth." (quoting *State v. Moran*, 728 P.2d 248, 255 (Ariz. 1986))). Furthermore, to the extent Lucio's argument challenges either (1) the state habeas court's application of Texas Rule of Evidence 702 or (2) the relevancy of this evidence under the Federal Constitution, it suffers from the same defects as Lucio's arguments concerning Pinkerman's opinion.

Finally, Lucio challenges the state habeas court's determination that her "complaint about [the] exclusion of her mitigation experts from the guilt-innocence portion of the trial is nearly identical to issues nine and ten raised on direct appeal." ROA.10091. "The maxim is well established in this circuit that a party who fails to make an argument before either the district court or the original panel waives it for purposes of en banc consideration." *Miller v.*

No. 16-70027

*Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005) (en banc). Because Lucio failed to raise this argument before the original panel, we hold that it is forfeited.[9]

## IV.

The various dissenting opinions contradict AEDPA, Supreme Court precedent, and the record in this case. Indeed, the dissents even contradict one another. If the dissenters cannot agree amongst themselves, they cannot expect our court to reach the level of certitude necessary to grant habeas relief. *Cf. Richter*, 562 U.S. at 103 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." (emphasis added)). Four of the dissenters' arguments merit additional responses.

## A.

First, the dissenters spill much ink relitigating the facts. For example, Judge Haynes emphasizes that "Lucio had trouble taking care of her many children." *Post*, at 79 (Haynes, J., dissenting). Judges Higginson and Higginbotham suggest Texas's foster-care system is the real culprit. *Id.* at 110 n.1 (Higginson, J., dissenting); *id.* at 63–69 (Higginbotham, J., dissenting). Or perhaps two-year-old Mariah killed herself. *Id.* at 80, 101 (Haynes, J., dissenting). Judges Haynes and Higginson suggest that Officer Escalon

---

[9] Lucio also argues that the "state court's process for determining the facts" was "itself unreasonable." As Lucio acknowledges, that argument is foreclosed by circuit precedent. *See Valdez*, 274 F.3d at 951 (holding "that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review"). We decline Lucio's invitation to overturn *Valdez*.

badgered Lucio during the interrogation. *Id.* at 80–82 (Haynes, J., dissenting); *id.* at 113 n.4 (Higginson, J., dissenting). And all the dissenters have much to say about how they'd weigh Pinkerman's testimony—notwithstanding the stark differences between what Pinkerman says today and what he proffered at trial, and notwithstanding the equally stark differences between the roles of federal judges and state jurors. *See id.* at 83, 88–90 (Haynes, J., dissenting); *id.* at 75–76 (Elrod, J., dissenting); *id.* at 111 (Higginson, J., dissenting); *id.* at 68 (Higginbotham, J., dissenting). Judge Elrod captures the dissenters' gestalt by saying Lucio confessed to beating to death her child and then framing the question presented as: "But did she?" *Id.* at 70.

AEDPA and Supreme Court precedent squarely foreclose this entire enterprise. Take for example *Cavazos v. Smith*, 565 U.S. 1 (2011) (per curiam). A California jury convicted Shirley Ree Smith of shaking to death her 7-week-old grandson. *Id.* at 2–5. At trial, the State called three experts who testified about the horrific injuries Smith inflicted on the baby. *Id.* at 3–5. The defense called two experts who testified that the baby "died from old trauma," or perhaps the real culprit was sudden infant death syndrome. *Id.* at 5. The Ninth Circuit reweighed this evidence, found the State's evidence insufficient, and granted relief under AEDPA. *Id.* at 6–7.

The Supreme Court summarily reversed. As to the evidence the jury heard, it was the jury's province—not the federal court's—to weigh it. *See id.* at 2 ("Because rational people can sometimes disagree, . . . judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold. The Court of Appeals in this case substituted its judgment for that of a California jury . . . ."). And as to evidence the jury did *not* hear—because Smith developed it after trial—that too failed to justify relief under AEDPA:

No. 16-70027

> The dissent's review of the evidence presented to the jury over seven days is precisely the sort of reweighing of facts that is precluded by *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), and precisely the sort of second-guessing of a state court decision applying *Jackson* that is precluded by AEDPA, 28 U.S.C. § 2254(d). The dissent's views on how 'adamantly' experts would testify today as opposed to at the time of trial are of course pure speculation, as would be any views on how a jury would react to less adamant testimony.

*Id.* at 8 n.* (quoting dissenting opinion by Justice Ginsburg). Exactly the same could be said about the dissents' reweighing of the evidence submitted to the jury (the conditions of Lucio's home, Officer Escalon's interrogation tactics, &c.) and their speculation about evidence not submitted to the jury (from Pinkerman's *post*-trial affidavit).

And even if AEDPA allowed the dissenters to redo the jury's job, the dissenters could not cherry-pick the facts. For example, one dissenter tells us that Lucio had "issues with . . . income and housing" and that she "could not pay her rent and was about to lose her apartment." *Post*, at 65 (Higginbotham, J., dissenting). The dissent omits, however, that Lucio's own expert attributed those financial troubles to Lucio's cocaine addiction. Villanueva testified that Lucio received approximately $5,000 every month in food stamps. ROA.15637–38. Yet her refrigerator was completely empty. ROA.15637–38. That's because—again, according to Lucio's own expert—Lucio and Mr. Alvarez sold the food stamps and spent the money on cocaine. ROA.15636. Then they made the children survive on one free meal a day at Loaves and Fishes. ROA.15638.

No. 16-70027

It's unclear what the dissenters hope to achieve from their counterfactual narratives. But whatever the purpose, the effort is foreclosed by AEDPA, Supreme Court precedent, and the record.[10]

## B.

Next, the dissenters repeatedly accuse us of "sua sponte" raising procedural arguments that the State waived. *See post*, at 78, 90–95 (Haynes, J., dissenting); *id.* at 71 n.1 (Elrod, J., dissenting); *id.* at 111 & n.2 (Higginson, J., dissenting). For example, some dissenters criticize us for holding that Lucio "procedural[ly] default[ed]" her claims. *Id.* at 90–93, 94 n.9 (Haynes, J., dissenting). Other dissenters accuse us of holding Lucio failed to "exhaust[]" her claims. *Id.* at 71 n.1 (Elrod, J., dissenting). These accusations are quite odd. We mention "default" only once above, and only as a description of the Court of Criminal Appeals' direct-appeal decision. *See supra* at 19. And we hold that Lucio *did* exhaust her claims. *See supra* at 20 &

---

[10] Amongst the most troubling of the dissents' factual inaccuracies is their collective assertion that Lucio offered Pinkerman and Villanueva to "'answer the one question every rational juror needs answered: If [Lucio] is innocent, why did [s]he previously admit h[er] guilt?'" *Post*, at 104 (Haynes, J., dissenting) (quoting *Crane*, 476 U.S. at 689); *see also id.* at 73, 75–77 (Elrod, J., dissenting); *id.* at 110–11 (Higginson, J., dissenting); *id.* at 64 n.1 (Higginbotham, J., dissenting). The dissenters cannot cite a single page of the record that suggests Lucio *ever* tried to justify admitting Pinkerman and Villanueva for that purpose. To the contrary, Lucio's trial lawyers made the strategic decision that it was better to deny that Lucio ever admitted her guilt rather than try to explain it away. As one of Lucio's lawyers told the jury at closing: "She confessed to what? She confessed to bruising that child from head to foot. She confessed to neglect. She didn't confess to murder." ROA.4789. Lucio's lawyers could've changed that strategy or even made inconsistent alternative arguments when proffering Pinkerman and Villanueva outside the presence of the jury. But the defense decided to maintain its no-confession theory to the very end. AEDPA prevents us from second-guessing that trial strategy. *See Pinholster*, 563 U.S. at 190 (holding that federal courts apply "doubly deferential" review to the strategic choices of counsel (quotation omitted)); *accord Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

n.5; *post*, at 95–96 (Haynes, J., dissenting) (agreeing with our exhaustion holding). Our sua sponte procedural holdings are nil.

All we've held is that Lucio has changed her complete-defense claim over time. That is an undisputed proposition. Lucio herself recognized it in her state habeas application. ROA.8029 n.36. Lucio conceded it in the district court. ROA.159. Both sides recognized it before our court. *E.g.*, Director's Opening En Banc Q&A 1–8; Lucio's Opening En Banc Q&A 1–11. And because Lucio changed her argument over time, we must analyze each claim as it existed at the time Lucio presented it to the state courts. *See Henry*, 513 U.S. at 366. That is hornbook law.

The dissenters appear to believe that a state prisoner can raise different claims at different times with different facts in the state court, then smush them all together into a single claim in federal court. This belief has no basis in law. Consider for example the Supreme Court's canonical decision in *Rose v. Lundy*, 455 U.S. 509 (1982). In that case, the state prisoner exhausted a prosecutorial-misconduct claim in state court. He based that claim on five comments the prosecutor made at trial. *Id.* at 511 & n.3. When Lundy got to federal court, however, he attempted to broaden his claim to include additional prosecutorial statements suggesting "that the State's evidence was uncontradicted." *Id.* at 511. The federal district court allowed Lundy to lump together his separate claims into a single prosecutorial-misconduct claim and then considered them in the context of the trial "taken as a whole." *Ibid.* The Supreme Court reversed and held that state prisoners must "seek *full* relief first from the state courts, thus giving those courts the first opportunity to review *all* claims of constitutional error." *Id.* at 518–19 (emphases added). The Court noted that this rule "reduces piecemeal litigation" by forcing prisoners to present the state courts with an *entire* claim and allowing the state courts to adjudicate it. *Id.* at 520 (emphasis in original);

No. 16-70027

*see also Boerckel*, 526 U.S. at 845 (holding prisoners must give state courts "a full and fair opportunity to resolve federal constitutional claims").

This eliminates the dissenters' various procedural objections. As in *Lundy*, Lucio certainly exhausted *something*. As in *Lundy*, the State concedes that here. As in *Lundy*, we can only consider the claim as Lucio exhausted it. And just as *Lundy* precludes a prisoner from smushing together separate prosecutorial-misconduct claims to create a new one that the state never considered, it also precludes Lucio from smushing together separate complete-defense claims to create a new one that amalgamates her factual and legal contentions at trial, on direct appeal, and in state habeas. *See also Pinholster*, 563 U.S. at 181–82 (holding the relitigation bar's "backward-looking language requires an examination of the state-court decision at the time it was made").[11]

It's no answer to say that the Texas courts were adjudicating the same complete-defense claim all along. *Post*, at 83, 88–90 (Haynes, J., dissenting); *id.* at 111 (Higginson, J., dissenting). That's for two reasons.

First, Lucio's claims are quite different—as she herself concedes. At trial, Lucio did not give the trial court the slightest hint that admission of the

---

[11] Two of the dissenters suggest that *Pinholster* requires us to mix together the Pinkerman affidavit (from state habeas) and the *Crane* claim (from Lucio's direct appeal). *See post*, at 92–93 (Haynes, J., dissenting); *id.* at 76 n.5 (Elrod, J., dissenting). Not so. *Pinholster* held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. At the time the state courts adjudicated Lucio's *Crane* claim on direct appeal, the Pinkerman affidavit did not even exist. Nothing in *Pinholster* required the direct-appeal court to predict what Lucio and Pinkerman would file in the future. And when Lucio and Pinkerman eventually did file the affidavit during her state habeas proceedings, nothing in *Pinholster* required the state habeas court to go back in time and re-adjudicate the *Crane* claim that Lucio already raised, especially given Lucio's express disclaimer of a *Crane* claim in her state habeas application. *See Pinholster*, 563 U.S. at 181–82; ROA 8029 n.36.

Pinkerman-Villanueva testimony was compelled by the Due Process Clause, *Crane*, or anything in federal law. The trial court repeatedly asked Lucio's trial lawyer to explain the basis for admitting the testimony. Counsel never explained why the testimony mattered; never said anything about Lucio's constitutional right to present a complete defense; never said anything about the jury's role in evaluating the credibility of Lucio's custodial statements; and never said anything that could come close to putting the trial court on notice that the question involved anything other than state evidentiary law.[12] It was not until her direct appeal that Lucio first invoked federal law, and even then she had to reimagine her trial proffer to do it. *See Lucio*, 351 S.W.3d at 900 (holding "[Lucio's] claim on appeal as to what Villanueva's testimony would have been does not comport with Villanueva's proffered testimony at trial"); *id.* at 902 (holding "[Lucio's] claim on appeal as to what Pinkerman's testimony would have been does not comport with Pinkerman's proffered testimony at trial"). And her claims at trial and on direct appeal differed again from her claim in state habeas, which added Pinkerman's affidavit but disclaimed any reliance on *Crane*. Cases like *Henry* and *Lundy* squarely foreclose Lucio from arguing one thing in state court and another broader thing in federal court. That's not a "sua sponte" procedural holding; that's application of AEDPA to the different claims that the state courts adjudicated on the merits at the various times they adjudicated them.

---

[12] The dissenters make much of the trial court's apparent absence from the courtroom during trial counsel's bill of particulars. *See post*, at 83, 89 (Haynes, J., dissenting). But they cite nothing to suggest the trial court's apparent absence violates any provision of state or federal law or any precedent from any state or federal court. And if the trial court was absent, that makes defense counsel's bill of particulars all the more indefensible. By hypothesis, Lucio's trial lawyer and Pinkerman could have put anything they wanted in the record—unpoliced by an apparently absent trial judge. And still they failed to say anything at all about *Crane*, the Due Process Clause, the complete-defense right, or anything in federal law.

No. 16-70027

Second, if the dissenters were right that Lucio did offer the exact same argument at all phases of her state-court proceedings, that *would* trigger a variety of procedural obstacles. As noted above, Texas has well-established procedural rules that prohibit prisoners from raising the same claim twice. *See supra* at 30 (citing *Ex parte Brown*, 205 S.W.3d at 546). And if Lucio violated that procedural rule by doing what the dissenters think she did, she would run headlong into the procedural-default doctrine. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750–51 (1991). We have refrained from applying that procedural bar only to be accused of applying it anyway.

## C.

Next, the dissenters offer competing theories of *Crane* and AEDPA. Some dissenters think AEDPA does not apply to Lucio's *Crane* claim, so our review is *de novo*. *See post*, at 78 n.3, 95–96 & n.10 (Haynes, J., dissenting). Others think AEDPA's relitigation bar applies but that Lucio can overcome it because the state court's decision runs "contrary to" *Crane*. *See id.* at 71 (Elrod, J., dissenting); 28 U.S.C. § 2254(d)(1). Still others think Lucio can overcome the bar because the state court "unreasonably applied" *Crane*. *See post*, at 78 (Haynes, J., dissenting); 28 U.S.C. § 2254(d)(1). The dissenters agree, however, that Lucio raised a "*Crane* claim" in her state habeas application—notwithstanding the fact that she expressly disclaimed any reliance on *Crane* in that very application. *See* ROA.8029 n.36. The dissenters do not offer a single citation to justify that novel habeas theory.

## 1.

Let's start with the dissenters' argument for *de novo* review. Those who defend the panel's application of that standard contend that "the state habeas court failed to adjudicate Lucio's complete defense claim on the merits because it erroneously determined that Lucio raised a state evidentiary

48

challenge and rejected that claim based on state evidentiary standards." *Post*, at 96 n.10 (Haynes, J., dissenting).

Not so. Lucio argued in her state habeas application that the trial court violated her right to a complete defense because "the evidence at issue here was not irrelevant to the issue of [her] guilt or innocence." ROA.8032. Lucio herself characterized the claim as one of state evidentiary law. The state habeas court addressed that argument head-on, finding no error in the exclusion of Pinkerman's proffered testimony because it "had no relevance to the question of [Lucio's] guilt or innocence." ROA.10091. We struggle to see how resolving an issue in the exact same terms presented can constitute a failure to adjudicate it.

The principles of comity and federalism that undergird the entirety of federal habeas for state prisoners dating back to Reconstruction require closer attention to the state-court litigation. So does the party-presentation principle that features so prominently in the principal dissent. *See post*, at 94 (Haynes, J., dissenting) (describing "the Supreme Court's admonition in *Sineneng-Smith*" as warning courts not to "step in on [their] own initiative" and "redo" the litigation).

2.

Next, consider the dissenters' "contrary to" argument. Judge Elrod reads *Crane* to clearly establish the "bedrock rule" that juries "must be allowed to hear competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Post*, at 74 (quotation omitted). She then says the state court's decision was "contrary" to this "bedrock rule." *See id.* at 76. She concludes that this case and *Crane* should come out the same way because they involve materially indistinguishable facts. *See id.* at 74–75 & n.3.

That analysis falters at every step. *Crane* does not establish—much less clearly establish—a universal, freestanding right to introduce competent and reliable evidence challenging a confession's credibility. The Supreme Court has repeatedly so held. *See Jackson*, 569 U.S. at 509–10; *Egelhoff*, 518 U.S. at 53; *accord supra* at 23–24. Rather, *Crane* holds that the wholesale "exclusion of this kind of exculpatory evidence" is constitutionally problematic "[i]n the absence of any valid state justification." *Crane*, 476 U.S. at 690. That's why the entire dispute in *Crane* hinged on the adequacy of Kentucky's justification for its blanket exclusion. *See supra* at 23–24. What was the justification? "[E]stablished Kentucky procedure" made "a trial court's pretrial voluntariness determination . . . conclusive." *Crane*, 476 U.S. at 686. *Crane* held these two things—a blanket evidentiary exclusion justified only by a "conclusive" pretrial determination of voluntariness—violate the Due Process Clause.

None of the state-court decisions in this case were "contrary to" *Crane*'s holding. Texas did not impose a categorical prohibition on evidence; it did not establish a procedure for excluding evidence through "conclusive" pretrial rulings; and it justified the trial court's decision as a mine-run, discretionary evidentiary decision in the face of a vacuous proffer by defense counsel. That's far afield from *Crane*.

It's no answer to say the state court "failed to even *identify* the correct legal principle." *Post*, at 72 (Elrod, J., dissenting) (emphasis in original). The Supreme Court has repeatedly explained that a state court need not cite any legal principle at all. *See Richter*, 562 U.S. at 98 ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2). There is no text in the statute requiring a statement of reasons."); *ibid.* ("As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not

No. 16-70027

require that there be an opinion from the state court explaining the state court's reasoning."). And where the state court offers an explanation, it "need not cite or even be aware of our cases under § 2254(d)." *Ibid.* (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

It's also no answer to declare that this case and *Crane* involve "materially indistinguishable facts." *Post*, at 74 (Elrod, J., dissenting). It is true that "here, as in *Crane*, the trial court pointed to a rule of evidence to find the testimony inadmissible." *Id.* at 75. But at that level of generality, *every* state-law evidentiary ruling in a criminal case implicates *Crane. Contra McGuire*, 502 U.S. at 67. That's why the Supreme Court has warned us not to "fram[e] [its] precedents at such a high level of generality." *Jackson*, 569 U.S. at 512; *accord post*, at 61 (Southwick, J., concurring). In fact, the Court summarily reversed our sister circuit for doing exactly what the dissenters propose here: "characterizing the cases as recognizing a broad right to present evidence bearing on . . . credibility." *Jackson*, 569 U.S. at 512 (quotation omitted).[13]

---

[13]    *Jackson* notwithstanding, Judge Elrod objects to our "materially indistinguishable" analysis. She criticizes our "suggest[ion]" that "if the facts are not *exactly* the same, the 'contrary to' exception automatically fails." *Post*, at 75 n.3. Of course, that's not what we say. We agree with Judge Elrod that AEDPA's "contrary to" prong can be satisfied through "imposition of a contradictory standard" or "a 'diametrically different' conclusion on 'materially indistinguishable' facts." *Ibid.* (quoting *Terry Williams*, 529 U.S. at 405); *see supra* at 24–25. But we disagree that *Terry Williams* or any other Supreme Court precedent supports a "contrary to" argument in this case. As the *Terry Williams* Court itself explained, "[i]t is difficult . . . to describe . . . a run-of-the-mill state-court decision as diametrically different from, opposite in character or nature from, or mutually opposed to . . . our clearly established precedent." 529 U.S. at 406 (quotations omitted). And a run-of-the-mill state-court evidentiary decision is exactly what we have here. *See supra* at 26–29, 49. "Although the state-court decision may be contrary to the [dissenters'] conception of how [*Crane*] ought to be applied in th[is] particular case, the decision is not 'mutually opposed' to [*Crane*] itself." *Terry Williams*, 529 U.S. at 406.

No. 16-70027

3.

The dissenters' final *Crane* theory is that the state courts unreasonably applied that decision.

Judge Haynes contends that this case is like *Crane* because in both cases a state court "excluded testimony . . . [a]s irrelevant." *Post*, at 103. It's true that *Crane* held that a state court cannot use a pretrial voluntariness ruling to justify the blanket exclusion of exculpatory evidence as "irrelevant." 476 U.S. at 687. But this case involves neither a pretrial voluntariness ruling nor a blanket exclusion of anything. Instead, the trial court *admitted* the type of evidence that would have been excluded in *Crane* when proffered by Lucio's sister. *See supra* at 26–27. That proves the State in this case did not have a blanket evidentiary prohibition, unlike in *Crane*. And it proves that the trial court excluded Pinkerman and Villanueva by applying a discretionary, non-categorical evidentiary rule, unlike in *Crane*.

Next, Judge Haynes argues that *Crane* applies to discretionary evidentiary decisions because the Supreme Court has not expressly held to the contrary. *See post*, at 104 ("[N]either *Chambers* nor *Crane* holds that a defendant's right to present a complete defense applies only when a state court excludes evidence based on categorical evidentiary rules."). But that gets the AEDPA relitigation inquiry backwards. Our task is not to determine whether Supreme Court precedent possibly permits Lucio to argue what she argued, but whether that precedent positively precludes the state court from holding what it held. *See* 28 U.S.C. § 2254(d); *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam). The absence of precedent commands the denial of relief to a state prisoner, not the grant of it.

Next, Judge Haynes insists that *Crane* applies to discretionary evidentiary decisions because the Supreme Court has so held. Judge Haynes acknowledges, as she must, that *Crane* limited its holding to "the *blanket*

No. 16-70027

exclusion of the proffered testimony about the circumstances of petitioner's confession"—but she suggests we should ignore that limitation because it's only "one line" in the Court's opinion. *Post*, at 105 (emphasis added by Judge Haynes) (quoting *Crane*, 476 U.S. at 690). Of course, it is not true that *Crane*'s limitations come from "one line" in the opinion.[14] And even if it was, *Crane*'s holding remains binding on us in all events.

It's even more troubling to interpret *Montana v. Egelhoff* as extending *Crane* from blanket exclusions to discretionary ones. *See id.* at 105–06. In *Egelhoff*, the Montana Supreme Court interpreted the Due Process Clause and *Crane* to establish "the right to present and have considered by the jury all relevant evidence to rebut the State's evidence on all elements of the offense charged." 518 U.S. at 41–42 (emphasis omitted) (quotation omitted). The Supreme Court emphatically reversed. *See id.* at 56. We are aware of no authority for turning the Supreme Court's rejection of one prisoner's claim into clearly established law that supports a second prisoner's claim. *Cf. Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) (holding a case rejecting one Fourth Amendment claim does not clearly establish the law for another Fourth Amendment claim).

Next, Judge Haynes asserts that *Crane* applies because the state court's discretionary ruling was not actually discretionary. *See post*, at 106. The theory seems to be that because Texas's relevance rule prohibits

---

[14] *Crane* is replete with references to the distinction between discretionary and categorical evidentiary rulings. *See* 476 U.S. at 689 ("We acknowledge . . . our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."); *id.* at 690 ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability . . . ."); *id.* at 691 ("[S]ince . . . Kentucky . . . has [not] advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence, the decision below must be reversed.").

irrelevant evidence in absolute terms, state courts necessarily act "mechanistically" and with "no discretion" when they apply it. *Ibid.* Not so. Court decisions are "discretionary" when they "involv[e] an exercise of judgment and choice." *Discretionary*, Black's Law Dictionary (11th ed. 2019). Both judgment and choice obviously abound when it comes to relevance determinations. *Crane* itself recognizes that trial judges are "called upon to make dozens, sometimes hundreds, of decisions concerning the [relevance] of evidence" in a given case. 476 U.S. at 689. *Crane* further recognizes that federal law gives judges "wide latitude" in making those decisions. *Ibid.* (quotation omitted). And state law does too. *See Brown v. State*, 96 S.W.3d 508, 511 (Tex. App.—Austin 2002, no pet.) ("Questions of relevance should be left largely to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion." (quotation omitted)); *see also post*, at 85, 103, 106 (Haynes, J., dissenting) (noting that the state habeas court reviewed the trial court's evidentiary ruling for abuse of discretion). We refuse to interpret the Due Process Clause to mean otherwise.

In her last effort to liken this case to *Crane*, Judge Haynes admits that the cases are distinguishable. *See post*, at 88. Judge Haynes seizes on the statement in *Crane* that "evidence surrounding the making of a confession bears on its *credibility* as well as its *voluntariness*." 476 U.S. at 688 (emphases added) (quotation omitted); *see post*, at 88, 97. From this statement, Judge Haynes concludes that Lucio can disclaim *Crane*'s *voluntariness* holding—as she did in her state habeas petition—while nonetheless relying on its *credibility* holding to support her complete-defense claim. *See post*, at 88, 97.

AEDPA prohibits this argument too. On direct appeal, Lucio characterized *Crane* as a case about the voluntariness of confessions. *See* ROA.10841; *post*, at 88 (Haynes, J., dissenting). She recognized that *Crane* applied the voluntariness requirement to police-created circumstances like

"how long the questioning lasted" and "how many policemen were there." ROA.10841. So she invited the Court of Criminal Appeals to extend *Crane*'s reasoning to a new form of involuntary interrogation statements—namely, those affected by battered woman syndrome. She did not, however, base her direct-appeal *Crane* claim on the theory that battered woman syndrome made her statements less credible, or that it made her less likely to have committed capital murder. That's why the Court of Criminal Appeals resolved Lucio's *Crane* claim in terms of voluntariness alone: she hadn't argued anything else. *See supra* at 10.

In state habeas, Lucio's understanding of *Crane* remained unchanged. She cited *Crane* only once—and only to disclaim any reliance on it. After all, Lucio continued to conceptualize *Crane* as a voluntariness case that restricted a trial court's ability to exclude "evidence regarding the circumstances under which [a] confession [i]s taken." ROA. 8029 n.36. And because Lucio had changed her defense strategy from challenging voluntariness to challenging "whether [she] was likely to have engaged in ongoing abuse of Mariah" in the first place, she no longer needed *Crane*. ROA.8029 n.36. So, if we take Lucio at her word, she was *not* trying to introduce expert testimony to "answer the one question every rational juror needs answered: If [Lucio] is innocent, why did [s]he previously admit h[er] guilt?" *Contra post*, at 79, 104 (Haynes, J., dissenting); *post*, at 70, 73–74 (Elrod, J., dissenting). Rather than contesting the credibility of her statements, Lucio contended the Constitution compelled the admission of Pinkerman's testimony because it "was relevant to . . . demonstrating that [she] did not have the propensity to commit violence against Mariah." ROA.8033–34. Some might wish that Lucio litigated the case differently. But we are not free to condemn the state court for addressing Lucio's claims as she presented them. *See also supra* at 44 n.10.

D.

Finally, the dissenters point to *Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019), and *Fieldman v. Brannon*, 969 F.3d 792 (7th Cir. 2020). *See post*, at 107–08 (Haynes, J., dissenting). Neither helps the dissenters.

*Scrimo* held that a state court violates AEDPA when it "fails to extend a principle of clearly established law to situations which that principle should have, in reason, governed." 935 F.3d at 112 (quotation omitted); *see also id.* at 114 (reiterating the failure-to-extend principle). Then *Scrimo* held the state court unreasonably failed to extend *Crane* by excluding certain witness testimony about drug deals. *See id.* at 108–10, 120. This is unhelpful to the dissenters for three reasons. First, no member of our court agrees with the Second Circuit's unreasonable-failure-to-extend reading of AEDPA. And that's for good reason—because the Supreme Court has squarely and expressly repudiated it. *See White*, 572 U.S. at 426 (rejecting "the unreasonable-refusal-to-extend rule on which respondent relies").

Second, far from supporting the dissenters, *Scrimo* holds "'[a] court does not unreasonably apply federal law in failing to guess a theory of relevance that was not argued at trial.'" 935 F.3d at 113 (quoting *Fuller v. Gorczyk*, 273 F.3d 212, 222 (2d Cir. 2001)); *see also Corby v. Artus*, 699 F.3d 159, 168 (2d Cir. 2012) ("The state trial judge was not required to read between the lines of counsel's motion to divine a previously unasserted legal theory . . . ." (cited and quoted in *Scrimo*, 935 F.3d at 113)). The fact that Scrimo's lawyer apparently articulated a *Crane*-based challenge to the exclusion of testimony in his trial does nothing to help Lucio, whose lawyer did not.

Third, when it came time to tackle specifics, the Second Circuit produced a rule that looks nothing like the rules the dissenters (or we) set forth here. *Compare Scrimo*, 935 F.3d at 115 ("If the evidentiary ruling was

correct pursuant to a state evidentiary rule, . . . [w]e consider whether the evidentiary rule is arbitrary or disproportionate to the purposes it is designed to serve. On the other hand, if the potentially exculpatory evidence was erroneously excluded, we must look to whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." (quotations omitted)), *with post*, at 99 (Haynes, J., dissenting) ("[A] state court violates a defendant's right to present a complete defense if (1) the excluded evidence was critical to the defense, and (2) the state court failed to provide a rational justification for its exclusion." (citations omitted)). The dissenters cannot claim to embrace *Scrimo* because they reject all three of these holdings.

They fare no better under *Fieldman*. There, the Seventh Circuit held that "the state trial court's exclusion of Fieldman's testimony was a decision contrary to" *Crane*. 969 F.3d at 800. Or perhaps it didn't. *See post*, at 107 n.20 (Haynes, J., dissenting) ("[A]lthough the court in *Fieldman* wrote that the state trial court's adjudication was 'contrary to' clearly established law, the holding was in fact based under the 'unreasonable application' prong."). We take no position as to whether the dissenters misunderstand *Fieldman* or whether *Fieldman* misunderstands itself. Either way, *Fieldman* turned on the state court's exclusion of the *defendant's own testimony* when he took the stand at trial. *See* 969 F.3d at 801. It's well-settled—outside of *Crane*—that trial courts cannot impose such limits on a defendant's own testimony. *See, e.g.*, *Rock*, 483 U.S. at 49. It's also irrelevant to this case.

\*     \*     \*

The judgment of the district court is AFFIRMED.

No. 16-70027

Leslie H. Southwick, *Circuit Judge*, joined by Costa and Willett, *Circuit Judges*, concurring:

I agree we should deny relief despite the difficult issue of the exclusion of testimony that might have cast doubt on the credibility of Lucio's confession.  That exclusion was the key evidentiary ruling at trial.  Able colleagues in dissent have shown the factual imperative that jurors hear this testimony.  Nonetheless, I cannot accept the legal reasoning of the dissenting opinions.  Instead, I conclude that current, clearly established Supreme Court authority falls short of permitting us to reject the state *habeas* court's consideration of that issue.

This separate opinion is offered despite the analysis contained in the erudite principal opinion for the court.  In a much more thorough manner than here, it explains the denial of relief.  I am unable to join all that is there and wish to explain my more limited reasons to affirm.

The dissenters express well their view that there was expert testimony that, if jurors had only heard it, could have impacted the verdict.  We are all, though, working within the constraints of AEDPA.  Its premise is that someone who has received a criminal conviction in state court has an initial means within the state-court system to challenge the validity of the conviction, then has a much more constrained means of challenging the state-court decision in federal court.

Fundamentally for me, what is at issue in the present appeal is whether a Supreme Court decision with language helpful to Lucio's claims, relied on by the dissenters but explained in other terms by this court's principal opinion, permits us to conclude that the state court erred in rejecting this claim and then to correct the error.

The precedent, of course, is *Crane v. Kentucky*, 476 U.S. 683 (1986).  Its relevance is to the exclusion of the expert testimony of Dr. John

No. 16-70027

Pinkerman and, less importantly, of Ms. Norma Villanueva. It is now argued that they would have explained for jurors why someone like this defendant, after hours of interrogation, would have falsely admitted to killing someone. Because Lucio's confession admitted to the essentials of the indictment, it was imperative that some doubt about the confession be created. The *Crane* decision certainly is helpful on that claim, most explicitly when it stated that a state court cannot be "permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690. Interpreting *Crane* as applied to our facts, both to what happened at trial and the proceedings since, is the difficult part of this appeal.

Exhaustion of the claim is one issue. A state prisoner must have "exhausted the remedies available in the courts of the State" on a claim before we may consider it. 28 U.S.C. § 2254(b)(1)(A). It seems the dissenters are correct that the State conceded that the issue is preserved. Regardless, in my view, exhaustion is not outcome-determinative.

The claim is that the state court unconstitutionally prevented the admission of reliable evidence bearing on the credibility of a confession, and that this evidence was central to the defendant's claim of innocence. A constitutional right to its introduction is said to arise under *Crane*, a decision predating the rulings in this case. Thus, the state court allegedly reached "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). To preview the conclusion of the analysis that follows, I state here that the interpretation of *Crane* that is necessary for relief in this case is not clearly established.

The principal opinion for the court already well explains that *Crane* reviewed a decision by a state's supreme court that analyzed for the first time

what a new rule of state procedure meant as to juror consideration of confessions. *See* KY. R. CRIM. P. 9.78 (repealed 2014). The state trial-court judge determined prior to trial that the confession was voluntary; at trial, the court excluded evidence relating to voluntariness as not being relevant to the jury's function. *Crane v. Commonwealth*, 690 S.W.2d 753, 753–54 (Ky. 1985), *rev'd*, 476 U.S. 683 (1986). The Kentucky Supreme Court agreed with excluding evidence as to voluntariness because the new procedural rule left it solely to the trial judge to decide that issue, while jurors could consider other challenges. *Id.* at 754.

The Court held there were three flaws in Kentucky's evidentiary rule: (1) it found no support in Supreme Court cases, (2) it was based on a misconception of the role of confessions at trial, and (3) "under the circumstances of this case, . . . [it] deprived petitioner of his fundamental constitutional right to a fair opportunity to present a defense." *Crane*, 476 U.S. at 687. The Court quoted a precedent that "evidence surrounding the making of a confession bears on its credibility," not just on "its voluntariness." *Id.* at 688 (quoting *Jackson v. Denno*, 378 U.S. 368, 386 n.13 (1964)).

The Court then identified a near consensus in the states as well as under federal rules to allow all evidence about a confession to be submitted to jurors regardless of a pretrial failure to suppress. Still, "even a consensus as broad as this one is not inevitably congruent with the dictates of the Constitution." *Id.* at 689. Important to my analysis of the opinion, the Court recognized that state trial judges need to make countless evidentiary decisions in a trial, and evidentiary rules may be applied that "serve the interests of fairness and reliability." *Id.* The facts in *Crane* easily permitted the Court to decide that this "blanket exclusion . . . deprived [Crane] of a fair trial." *Id.*

The Supreme Court did not choose among different possible constitutional sources for its holding. It held that what Kentucky was doing violated this defendant's right for "a meaningful opportunity to present a complete defense." *Id.* at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). There was "no new ground" being broken in saying that the "opportunity to be heard" is fundamental to due process, and a component of that is to permit the introduction of "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.*

One possible explanation of what was "clearly established" by *Crane*, even if not with clarity, is that the decision invalidated the application of any evidentiary rule that creates a "blanket" bar to a category of evidence and in the specific case prevented a defendant from presenting a meaningful defense. I agree with that sense of the Court's opinion. Another possibility is that a federal court may grant relief based on an everyday evidentiary ruling, such as the one about relevance in this case, when that ruling prevented a defendant from introducing evidence that can be characterized as central to the defense. Based on *Crane* itself and on other caselaw, my view is that the opinion does not apply to a simple, discretionary, even if errant, evidentiary decision by a state-court judge. To make every evidentiary ruling a potential issue of constitutional dimension is beyond my understanding of *Crane*.

Of particular importance to my conclusion about *Crane*, the Supreme Court has emphasized — in this precise area of limits on examination of witnesses — that lower courts must be careful in defining "clearly established law." To conclude that its precedent supports a "broad right to present 'evidence bearing on [a witness'] credibility,'" the Court held, was framing "clearly established Federal law" at too "high [a] level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (first alteration in

original).   I find no Supreme Court opinion holding that an error in the discretionary application of a general evidentiary standard is a constitutional violation.

Related precedents often have addressed a rule governing some evidentiary category, starting with *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973), which concerned a bar to any evidence that ran afoul of the common-law voucher rule; then *Rock v. Arkansas*, 483 U.S. 44, 62 (1987), in which hypnotically refreshed testimony was inadmissible; later, *United States v. Scheffer*, 523 U.S. 303, 305 (1998), which concerned a military evidentiary rule barring polygraph results; and *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006), which involved a prohibition of any evidence of third-party guilt.

In summary, I conclude that *Crane* overrides any blanket evidentiary rule that prevented introduction in the particular case of reliable, competent evidence central to the defense.  For Lucio to succeed, *Crane* must do more. Perhaps the Supreme Court will interpret *Crane* more broadly, but I cannot, in light of what I have expressed here, conclude that *Crane* clearly established law helpful to Lucio.

My joining the refusal to allow relief in this case comes from the interplay of my interpretation of the limitations that AEDPA places on federal courts and my analysis of the limitations of *Crane*.  This case, though, is a clear example that justice to a defendant may necessitate a more comprehensive review of state-court evidentiary rulings than is presently permissible under law that is established with sufficient clarity.

No. 16-70027

PATRICK E. HIGGINBOTHAM, *Circuit Judge*, joining Judge Haynes's dissent:

Dancing with words cannot mask the reality that we execute few with means and by metrics flowing from the pens of judges faithfully drawing upon fealty to an abstraction of our "federalism," one that screens the performance of poorly funded state judicial systems—themselves victims of political subscription to the death penalty while refusing to fund it. As the Court majority upholds the ending of one life at the hand of the state—Melissa Lucio's, now on death row for twelve years—it perversely eases the slide to the end of the death penalty. It does so with a hawking, adversarial draw upon the jurisprudence of capital punishment with springs at every turn. This with a prosecution deeply flawed from its inception and leaving our hand as a failure at every level of government, shadowed by a threadbare narrative leaving backstage Melissa's story, including the role in her life of Texas's Department of Family and Protective Services, for good or naught. To these eyes, it need not and should not have happened, as the thoughtful dissenting opinions explain. I here add a few lines to bring to the fore Melissa's life and her history with DFPS, specifically Child Protective Services, a history that frames this case.

## I.

Melissa's father abandoned his wife and six children, leaving Melissa's mother as the family's sole provider. Melissa's mother was drawn to dalliances with men who did not contribute to the family's wellbeing, so care for Melissa and her siblings often devolved to these men while their mother struggled for their living. At age six, Melissa suffered sexual abuse at the hands of one of her mother's live-in lovers. This continued, with her mother's acquiescence, until Melissa was eight years old. Abuse would remain a feature of Melissa's relationships with the men closest to her. At age sixteen, she dropped out of high school to marry Guadalupe Lucio and

bore him five children by the time she turned 24. Guadalupe was a physically and emotionally abusive alcoholic, who abandoned Melissa and his children in 1994. So too was his successor Robert Alvarez, who, among other reported incidents, publicly punched Melissa. Yet on the night Mariah died, after hours of interrogation, it was Robert, not a lawyer, who Melissa asked Ranger Escalante to see.[1]

CPS's involvement with Melissa began in 1995, when the agency charged her with "neglectful supervision" but took no action. By 1998 at the latest, CPS was aware that Robert in service of himself had introduced Melissa to cocaine. Between 1999 and 2000, CPS learned that with the birth of Gabriel, both mother and child tested positive for the drug. CPS records reflect that in 2000, Melissa's children told investigators that she, Robert, and another adult male in the household were "using drugs." CPS conducted no investigation or drug testing in connection with the 2000 report and left the children in Melissa's care.

CPS recorded two drug-related incidents with Melissa in November and December of 2001, as well as two apparently separate incidents of "physical neglect." Again, CPS performed no drug tests and made no inquiry concerning the nature or quantity of drugs involved. In 2002, CPS recorded a charge of neglectful supervision against Melissa, prompted by reports that her young son had been seen in the street "chasing cars" and that several of

---

[1] It is telling that at 3 a.m., after being denied the opportunity to see Robert, Melissa said to Escalante "I don't know what you want me to say. I'm responsible for it," before making a series of admissions that the State relied on as a confession of responsibility for Mariah's death. At Escalante's prompting, Melissa conceded that she spanked and pinched Mariah at times, without ever admitting to striking the cranial blows that proved fatal. But overlooking the equivocal nature of her confession, Melissa was denied the opportunity to explain why she would have taken responsibility for Mariah's death if she did not inflict the fatal injuries.

her daughters were engaged in inappropriate sexual activity. In 2003, CPS was informed that another of Melissa's children, Sara, tested positive for cocaine at birth. CPS recorded additional charges of neglectful supervision and physical neglect in 2004, just prior to Mariah's birth; CPS closed those cases without taking any action. Mariah tested positive for cocaine shortly after her birth at Melissa's home in September 2004.

CPS records indicate that Melissa was directed to undergo substance abuse counseling and parenting courses, but the records reflect that she seldom remained with these programs. Case notes consistently reflect issues with Melissa's income and housing; CPS documented that the family was homeless at least once. Case notes also reflect CPS's awareness of a consistent set of behavioral problems for the Lucio children, including physical aggression to the point of violence and sexual misbehavior. On more than one occasion, there was evidence that the older children had beaten their younger siblings, but CPS made little, if any, inquiry into these incidents.

CPS removed Melissa's children from her care for a period spanning September 2004 to November 2006. In December 2006, with many of Melissa's children just returned to her from foster care, CPS's intervention was required again because Melissa could not pay her rent and was about to lose her apartment. CPS conducted a drug test—Melissa was negative—and provided her with rent support. CPS had no recorded visits with Melissa in January or February 2007 prior to Mariah's death.

These facts compel the observation that the tragedy of Mariah's death unfolded against the depressingly familiar background of the State's struggle with CPS's systemic failures, now documented in this Court's recent

No. 16-70027

opinions.[2] We there observed that DFPS, and by extension CPS, have persisted in a state of "organizational and administrative chaos" for decades resulting in an "epidemic of physical and sexual abuse" among the thousands of children in its care;[3] that "[w]here children have reported abuse or neglect to the agency, investigations are inadequate;" that DFPS sports a 75% error rate in its investigations of abuse;[4] that "DFPS's inability to prevent abuse is exacerbated by its incompetence in responding to incidents once they have occurred."[5]

As of 2019, there were roughly 51,000 children in DFPS's legal care, with several thousand more throughout Texas receiving family preservation services.[6] Its "caseworkers handle, on average, 28 children's cases at a time, with caseworkers at the upper end of the distribution handling 40, sometimes 60."[7] By the State's own reckoning, these caseloads greatly exceed what is practicable for any individual caseworker.[8] As we previously recognized,

---

[2] *See M.D. by Stukenberg v. Abbott (Stukenberg I)*, 907 F.3d 237, 260–68 (5th Cir. 2018); *M. D. by next friend Stukenberg v. Abbott (Stukenberg II)*, 929 F.3d 272, 281–93 (5th Cir. 2019) (Higginbotham, J. concurring in part and dissenting in part).

[3] *Stukenberg II*, 929 F.3d at 284 (Higginbotham, J. concurring in part and dissenting in part).

[4] *Stukenberg I*, 907 F.3d at 292.

[5] *Id.* at 291.

[6] *See CPS Conservatorship: Children in DFPS Legal Responsibility*, Texas Dep't of Fam. & Protective Servs., https://www.dfps.state.tx.us/About_DFPS/Data_Book/Child_Protective_Services/Conservatorship/Children_in_Conservatorship.asp.

[7] *Stukenberg I*, 907 F.3d at 290.

[8] "DFPS produced a Work Measurement Study, which concluded that 'DFPS caseworkers expended an average of 9.7 hours per month on case profiles most often associated with PMC children, and that these workers had an average of 137.9 hours per month to spend on their casework.' Dividing the average time available (137.9) by the average time per case (9.7), each PMC caseworker could handle a caseload of 14

"high caseloads [] are a direct cause of high turnover rates," and "DFPS experiences extraordinary turnover among caseworkers."[9] By conservative estimates, "16% of caseworkers leave in their first six months, 25% in their first year, and 43% in their first two years."[10] The high attrition rates among caseworkers in turn "exacerbate the caseload problem."[11] With evidence that these problems have been presented to the State "repeatedly over the past two decades," this Court determined "that the State is deliberately indifferent to the risks posed by its policies and practices" to the children in its care.[12]

In its long superintendence of Melissa, DFPS never recorded or expressed concern that she physically abused any of the children in her care. To its credit, despite the difficulties of managing this large enterprise,[13] it recognized that Melissa's troubles centered on her inability to escape a succession of relationships with dominating and abusive men who to their own ends, encouraged her use of cocaine, a stimulant. That reality is strong footing for Melissa's claimed denial of the opportunity to present a complete defense: that she only tried to accept the blame for the acts of others, a

---

children. On the basis of the DFPS Study, the Special Masters recommended that the district court order DFPS to implement a caseload standard in the range of 14 to 17 PMC cases per caseworker." *Stukenberg I*, 907 F.3d at 301.

[9] *Id.* at 260, 291.

[10] *Id.* at 291.

[11] *Id.* at 260.

[12] *Id.*

[13] DFPS is a participant in a form of cooperative federalism through which the agency receives well over $700 million in federal funding, annually, representing roughly half of the agency's yearly budget. *Stukenberg II*, 929 F.3d at 290 (Higginbotham, J. concurring in part and dissenting in part) ("[R]oughly half of the State's child-welfare agency spending [is] covered by federal funds, over $730 million in fiscal year 2016.").

No. 16-70027

phenomenon of personality produced by her own lifetime of abuse in a world of abject poverty.

## II.

This is not the story writ large. It is the story drawn from the trial record—the factual matrix against which the now assailed proffers of counsel and Dr Pinkerton were made. Their words take their full meaning—not as an excised, freestanding abstraction—but as they were laced into the narrative fabric. Only with a walk away from the developed facts of the full record can the denial of Melissa's sole defense be shrunk into an "evidentiary ruling" with its attending judicial discretion, one that, if rejected, it is then said would bring a cascade of federal reviews of state court rulings in defiance of federalism. But, of course, the walk away elides the reality that even the nigh routine matters of the constitutional order must have their factual footing.

The footing here for Melissa's claim that she was denied a complete defense cannot be brushed aside with an assertion that the trial court and hence the courts that followed were not put on notice. Facts matter. In this morality play of citizen decisions of life or death, the jury represents the people, but they did not hear her defense.[14] The trial court ruled that

---

[14] The defense of false confession has for decades played a prominent role in exonerations. *See* Samuel Gross and Maurice Possley, *For 50 Years, You've Had "The Right to Remain Silent" So why do so many suspects confess to crimes they didn't commit?*, THE MARSHALL PROJECT (June 12, 2016), https://www.themarshallproject.org/2016/06/12/for-50-years-you-ve-had-the-right-to-remain-silent. It is not an esoteric creation of the defense bar, but a widely recognized phenomenon. *See, e.g.*, Richard Leo, *False Confessions: Causes, Consequences, and Implications*, 37, J. Am. Acad. Psychiatry & L. (September 2009), http://jaapl.org/content/37/3/332. The State adopted one of the recommended responses to this problem by taping the interrogation. But it ignored the recommendation that extended accusatorial tactics be banned.

No. 16-70027

Melissa's proposed defense was irrelevant to the question of her guilt or innocence, a ruling that amounted to a complete rejection of her defense, one not based on any deficiency in its presentation. For all the years that CPS looked over her shoulder it never found physical abuse; this child did not die of neglect, but of violent blows to her head so powerful as to produce fatal subdural bleeding. Whether these injuries could have been from a fall down the stairs or by a stronger hand than Melissa's was disputed. The jury was entitled to hear her defense that it was not Melissa who struck the blow. And as Melissa well knew, the death of a child in her custody meant the automatic removal of all children from her custody, leaving her without support. It is plain that, with a fair reading of this record, the Court steps on no sovereign interest of the state, as explained by the Supreme Court in *Crane*.

No. 16-70027

JENNIFER WALKER ELROD, *Circuit Judge*, joined by HIGGINSON, *Circuit Judge*, dissenting:

Melissa Lucio is not without culpability. Her young daughter, Mariah, endured a shockingly violent life, suffering horrific abuse that Lucio either perpetrated or tolerated. After Mariah's death, a Texas jury convicted Lucio of capital murder, and Lucio was sentenced to death.

Lucio now sits on death row. Twelve jurors representing a cross-section of Cameron County concluded that Lucio killed her child, almost certainly because Lucio—five hours into interrogation on the night Mariah died—acceded to the interrogator's pressing that she "did it."

But did she? At trial, Lucio was barred from offering evidence to explain why she would confess if she were innocent.

In America, the vilest offenders—including abusers and murderers of children—are entitled to every protection that the Constitution guarantees. The Sixth Amendment has been called "the heartland of constitutional criminal procedure," enshrining three clusters of rights so that criminal trials—designed to pursue truth and protect innocence—are speedy, public, and fair. *See* Akhil R. Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641, 641–43 (1996). And the Supreme Court has unanimously held that the right to be heard, an indispensable element of a *fair* trial, forbids the State from excluding, categorically, "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). With confessions, content cannot be divorced from context.

That's the lone issue in this case: Should a capital defendant be allowed to explain to a jury how to square her adamant profession of innocence today with her apparent confession of guilt yesterday?

No. 16-70027

\*     \*     \*

Lucio exhausted her complete-defense claim in the state court,[1] which rejected the claim on the merits. Thus, under AEDPA, we may only grant habeas relief if that rejection was "contrary to" or "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The principal dissent turns on the latter ("unreasonable application"), and I agree. I would go even further and say the adjudication was "contrary to" that law.

When is a state court decision a collision versus a misapplication?

- A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law *or* if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (emphasis added).

- A decision is an "unreasonable application" of Federal law "if the state court identifies the correct governing legal principle

---

[1] The plurality opinion makes much of how Lucio phrased her claims throughout the various pleading stages. But as my fellow dissenters have emphasized, the State affirmatively waived any exhaustion arguments by (1) expressly stating before the district court that "Lucio raised this claim in state habeas proceedings," (2) analyzing and arguing against the merits of Lucio's complete-defense claim (applying the same Supreme Court cases that Lucio now asks us to consider), and (3) expressly raising an exhaustion defense against some of Lucio's claims but not the complete-defense claim. *See Carty v. Thaler*, 583 F.3d 244, 256 (5th Cir. 2009) (explaining that a waiver of exhaustion must be express but that AEDPA "does not require 'magic words' "); *id.* (finding express waiver of exhaustion on appeal where the State argued in the district court that one claim—not at issue on appeal—was not exhausted but did not raise the same argument with respect to other claims). "Clearly," the State "considered exhaustion as a defense and chose not to exercise that defense." *Id.*

No. 16-70027

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

In my view, the state court failed to even *identify* the correct legal principle, let alone apply it, reasonably or otherwise.[2]

I

As all agree, *Crane v. Kentucky*, 476 U.S. 683 (1986), is our North Star. I recap the facts at length to underscore exactly what the Supreme Court considered and what it did not. And to make clear that today's case is about *applying Crane*, not *extending* it.

In *Crane*, the petitioner moved to suppress his confession to murder. *Id.* at 684–85. The trial court determined that the confession was made voluntarily and denied the motion. *Id.* at 685. Then, at trial, petitioner sought to introduce testimony regarding the physical and psychological environment in which the State obtained the confession for the purpose of demonstrating that the confession was "unworthy of belief." *Id.* The trial court determined that this testimony pertained exclusively to the issue of whether his confession was voluntary—which, under a Kentucky evidentiary rule, could not be re-adjudicated—and deemed it inadmissible. *Id.* at 686. The Court heard the case to determine "whether the exclusion of testimony about the circumstances of the confession violated petitioner's rights under the Sixth and Fourteenth Amendments to the Federal Constitution"—the "constitutional right to a fair opportunity to present a defense." *Id.* at 686–87.

---

[2] The state court rejected Lucio's complete-defense argument because, the court reasoned, her claim was "nearly identical to [the issues] raised on direct appeal," and the trial court did not abuse its discretion in excluding Dr. Pinkerman's testimony.

No. 16-70027

The Court began by explaining the importance of the right to challenge the credibility of a confession. It noted that "the Court has never questioned that evidence surrounding the making of a confession bears on its credibility" and that "the defendant[ has a] traditional prerogative to challenge the confession's reliability during the course of the trial." *Id.* at 688 (internal quotation and emphasis omitted). *See also Lego v. Twomey*, 404 U.S. 477, 485–86 (1972) ("A defendant has been as free since *Jackson*[ *v. Denno*, 378 U.S. 368 (1964),] as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness."). That's why the Court "has expressly assumed that evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess." *Crane*, 476 U.S. at 688.

The relevance of this evidence is not limited to assessing a confession's voluntariness; the circumstances surrounding a defendant's incriminating statements "can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Id.* at 688–89. There is a simple reason for this. As the Court explained, a confession does not necessarily mean guilt: "as with any other part of the prosecutor's case, a confession may be . . . unworthy of belief." *Id.* at 689 (internal quotation omitted). Thus, the Court stressed, if the defendant is barred from presenting testimony regarding the circumstances of his confession, he is "stripped of the power to describe to the jury the circumstances that prompted his confession, [and] the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id.*

The Court went on to acknowledge that it has a general "reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts," and it emphasized that it had "never questioned the power of

73

States to exclude evidence through the application of evidentiary rules that themselves *serve the interests of fairness and reliability*." *Id.* at 689–90 (emphasis added) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). But given the facts of the case, it had "little trouble concluding" that the "blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." *Id.* at 690.

As the unanimous *Crane* Court put it, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). And it added this admonition: "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* Therefore, the Court held, "[i]n the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Id.* at 690–91 (citation omitted).

So that's the bedrock rule we're applying: The jury must be allowed to hear "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690. And that's the bedrock rule Lucio argues the state court contravened.

## II

In my judgment, the state court flouted *Crane* when it rejected Lucio's complete-defense claim by excluding Dr. Pinkerman's testimony as having "no relevance to the question of [Lucio's] guilt or innocence." In *Crane*, on materially indistinguishable facts, the Supreme Court expressly foreclosed

this conclusion.[3] Here, as in *Crane*, the State's case relied principally on the defendant's inculpatory statements to argue that she committed the crime.[4] If the confession was false, then the State's case crumbles. Also here, as in *Crane*, the trial court pointed to a rule of evidence to find the testimony inadmissible. The *Crane* Court unanimously held that trial courts commit constitutional error when they make such a determination.

The rule again: A trial court cannot reject "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Crane*, 476 U.S. at 690. There is no question that Dr. Pinkerman's proffered testimony was "reliable" and "competent"—neither party, nor the court, challenged his qualifications. And Dr. Pinkerman's testimony regarding the credibility of Lucio's supposed confession is central to her defense. Lucio sought to argue that she only confessed to causing Mariah's injuries because she suffers from Battered Woman Syndrome and often takes blame for things that are not her fault, particularly when under the control of a male figure (here, Officer

---

[3] *Williams*, 529 U.S. at 406 (explaining the key inquiry is whether the facts are "materially indistinguishable"); *cf. Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." (citation omitted)). The plurality opinion suggests that if the facts are not *exactly* the same, the "contrary to" exception automatically fails, even though there are two ways in which the "contrary to" prong can be satisfied: imposition of a contradictory standard (as occurred here) *or* a "diametrically different" conclusion on "materially indistinguishable" facts (which *also* occurred here). *See Williams*, 529 U.S. at 405.

[4] For instance, the State's closing argument stressed that it is "unbelievable" that Lucio caused Mariah's other injuries—to which Lucio had confessed—but that she never hit Mariah in the head. Because Lucio confessed to otherwise harming Mariah, the State argued, "the inference is clear that she caused [the head] injuries because it's consistent. It's consistent with her behavior. It's consistent with her pattern of conduct towards this child." Lucio must have delivered the final blow.

Escalon).[5] Without Lucio's confession, the State had no direct evidence that she hit Mariah in the head, causing the fatal injury. The rule in *Crane* is clear; yet the state court declined to apply it.

Federal habeas relief isn't for correcting run-of-the-mill state law errors. But it is for correcting a state court's evidentiary ruling that violates a defendant's weighty interest in meaningfully presenting to the jury her version of the facts, particularly the circumstances surrounding her "confession," the State's strongest piece of evidence.

*Crane*'s holding clearly established that a court may not exclude reliable testimony regarding the credibility of a confession where that evidence is central to the defendant's innocence claim. Dr. Pinkerman's proffered testimony was reliable. It spoke to the credibility of Lucio's confession. And the credibility (or lack thereof) of Lucio's confession was central to her claim of innocence. She had a constitutionally enshrined right to present her complete defense. And without her expert, she was categorically denied the ability to scientifically explain about how Battered Woman Syndrome played a role in her supposed confession.

---

[5] The plurality opinion notes that Dr. Pinkerman's affidavit concerning the circumstances of Lucio's interrogation and her experience with Battered Woman Syndrome was not presented during the original proffer at trial. *See* Pl. Op. at 29, 39. But, as the principal dissent explains, that affidavit is not precluded from our review. The State conceded as much in its response to our en banc questions, stating "*Cullen v. Pinholster*, 563 U.S. 170, 180 (2011), indicates that this Court may also consider Dr. Pinkerman's 2010 affidavit because it was part of the record in the state court." In *Cullen*, the Supreme Court held that our review "is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. Here, we are asking whether the state-court adjudication of Lucio's complete-defense claim was contrary to clearly established law; therefore, we must review "the record in existence at *that* same time *i.e.*, the record before the state court." *Id.* at 182 (emphasis added). That record included Dr. Pinkerman's affidavit.

No. 16-70027

\*      \*      \*

Mariah suffered appalling abuse, including at the hands of her mother. Lucio is not without blame. But neither is she without rights. And the Sixth Amendment protects Lucio's right to put on her defense.

Sound criminal procedure must adhere to sacred first principles. The Supreme Court is rightly exacting in death penalty cases, and Lucio has a constitutional right to present a complete defense. In my view, the state court disregarded clearly established federal standards and ignored materially indistinguishable Supreme Court precedent.

With great respect, I dissent.

No. 16-70027

HAYNES, *Circuit Judge*, joined by HIGGINBOTHAM, STEWART, DENNIS, ELROD, GRAVES, and HIGGINSON, *Circuit Judges*, dissenting:

Is the conclusion that evidence refuting the core of the State's case against the defendant is irrelevant an unreasonable application of clearly established Supreme Court precedent? Yes. Period. That is the crux of why the district court erred in rejecting Lucio's complete defense claim.

Unfortunately, the plurality opinion[1] drives down numerous backroads untraversed by the parties, basing its affirmance largely on issues that were never raised by either party and necessitating a lengthier response in this opinion. The plurality opinion makes procedural arguments on the State's behalf that the State clearly (and intentionally) waived, ignoring the Supreme Court's recent reminder that we are "passive instruments of government" that should "decide only questions presented by the parties." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (internal quotation marks and citation omitted). In addressing only those issues properly before us, I conclude that the state habeas court's adjudication of Lucio's complete defense claim with regard to expert witness Pinkerman[2] involved an unreasonable application of *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Chambers v. Mississippi*, 410 U.S. 284 (1973).[3] Pinkerman's

---

[1] It is ironic that the plurality opinion claims that the dissenting opinions disagree with each other when, in fact, the exact same number of judges join this dissenting opinion (7) as join the plurality opinion (7).

[2] As the plurality opinion states, Lucio also challenges the trial court's refusal to allow a different expert, Norma Villanueva, to testify. Because of my conclusions regarding Pinkerman, it is not necessary to examine whether the state habeas court's adjudication of Lucio's complete defense as it relates to Villanueva involved an unreasonable application of *Crane* and *Chambers*.

[3] I address this case applying AEDPA deference because the majority of our en banc court (several members of our court who conclude that Lucio should prevail as well as those in the plurality opinion) have determined that the state habeas court did adjudicate the merits of Lucio's complete defense claim. I, however, continue to subscribe to the panel

No. 16-70027

testimony would have explained Lucio's tendency to take blame for everything that goes on in the family and refuted the State's core "evidence" of Lucio's guilt: her interrogation statement characterized by the State as her "confession." The testimony thus would have "answer[ed] the one question every rational juror need[ed] answered" before determining Lucio's innocence: "If [Lucio] is innocent, why did [s]he previously admit h[er] guilt?" *Crane*, 476 U.S. at 689. The state trial court erroneously excluded the testimony as irrelevant, and the state habeas court in turn unreasonably applied Supreme Court precedent in concluding that the exclusion did not violate Lucio's right to present a complete defense. For these reasons, I respectfully dissent from the plurality opinion's judgment, and I would reverse the district court's order denying Lucio's federal habeas claim and remand for the district court to grant Lucio relief.

## I. Background

### A. Factual Background[4]

Lucio lived in an apartment accessed by a steep exterior staircase with her husband, Robert Alvarez, and nine of her children. *See Lucio v. State*, 351 S.W.3d 878, 880 & n.1 (Tex. Crim. App. 2011). Lucio had trouble taking care of her many children: Lucio's older children were "aggressive to the point

---

opinion's conclusion that Lucio's complete defense claim merits de novo review because she exhausted her claim in state court and the state court failed to adjudicate her claim on the merits. Under de novo review, the state trial court denied Lucio of her right to present a complete defense when it prevented Pinkerman from testifying. Some judges joining in this dissent join in this footnote; some do not. But, under either standard of review, the result is the same: the district court erred in denying Lucio federal habeas relief.

[4] This opinion does not engage in "relitigating" facts or "weighing evidence." Plurality Op. Section IV.A. The reason to include a recitation of the facts is to understand why the *absence* of evidence is critical here. The jury was deprived of key evidence to weigh: that is the point.

No. 16-70027

of becoming violent," and Lucio had difficulty disciplining her children. Mariah, Lucio's youngest, developed behavioral issues; she would hit her head when having tantrums. A few months later, paramedics responded to a call to Lucio's home and found Mariah dead, "face up on the floor" and with Lucio, Robert, and a number of children nearby. Lucio told the paramedics that Mariah "fell down the stairs," and Lucio was taken in by police for questioning.

Lucio's interrogation on the night her daughter was found dead was not as straightforward as the plurality opinion suggests. *See* Plurality. Op. at 3. Her interrogation was over five hours long, lasting from before 10:00 p.m. to after 3:00 a.m. For the first three hours, Lucio maintained that, although she sometimes spanked her children, she did not hit or abuse Mariah, and she did not know who caused Mariah's injuries. She also described Mariah's physical condition leading up to her death: Mariah was "sick" on the Saturday that she died and the Friday before, but Lucio did not take Mariah to the doctor. Mariah would not eat, and her breathing was heavy. She slept all day Saturday, and she would lock her teeth together when Lucio would try to feed her.

More than three hours after the interrogation began, after 1:00 a.m., Texas Ranger Victor Escalon entered the room and told Lucio—in a long, mostly one-person exchange—that the officers needed her story and that everyone would understand if she had hurt her daughter. At that point, Lucio told Escalon that she wanted a cigarette and wished to talk to her husband. Escalon told her that she could do those things after he took her statement. Escalon then asked Lucio, repeatedly, to tell him "everything."

Lucio eventually told Escalon that she "would spank [Mariah], but [Lucio] didn't think [she] would spank her, to where . . . to where it got to this point." Escalon prompted Lucio for more detail, but she responded, "I

80

don't know what you want me to say.  I'm responsible for it."  At Escalon's suggestion, Lucio agreed that the spanking was "all over [Mariah's] body." She maintained that she was not angry at Mariah but was "frustrated" by the other kids who were "very hyper," making it difficult to take care of them all.  She also stated that she bit Mariah one day while tickling her; she did not know why she did it.  While making these statements, Lucio continued to maintain that she had not hit Mariah in the head and had only spanked her.

Lucio also stated that no one else was responsible for Mariah's injuries and that she was the only one who spanked her.

As the interrogation progressed, Escalon identified specific bruising on Mariah and asked Lucio to tell him how it happened.  Lucio usually responded that she did not know how the bruises occurred and often said she that did not hit Mariah in particular spots.  When Escalon insisted that Lucio was responsible for specific bruises, she responded, "I guess I did it."  She suggested that some of Mariah's other injuries, like scratches, could have been caused by her other daughters.  For some of the bruises, Lucio said she was the one who caused them, and said she would sometimes spank Mariah when she woke up other kids.

Escalon then had Lucio take a break at 1:22 a.m.  After the break, officers took DNA samples from Lucio, then took another break.

At 3:00 a.m., Escalon resumed the interrogation.  He brought in a doll to have Lucio show him how she bit and spanked Mariah.  When Lucio was showing Escalon how she bit Mariah, Escalon asked if she was angry at Mariah.  She said no, explained that she was frustrated with the other kids, and described how she bit Mariah after she finished brushing Mariah's hair. When asked why she bit Mariah, Lucio said, "I just did it."  Escalon then asked Lucio to show how she spanked Mariah.  When she demonstrated, Escalon told her, "Well do it real hard like . . . like you would do it."  When

she said that her demonstration was how hard she spanked Mariah, Escalon himself performed what he thought was a hard spank and had Lucio demonstrate again.  He identified several sets of bruises and had her spank the doll in those areas to demonstrate how she would have spanked Mariah.

At Lucio's trial for capital murder, the State's theory of the case depended on two critical points.  First, the State sought to prove that Mariah's death was caused by a fatal blow to the head that could not have been sustained from Mariah falling down the stairs, using a forensic pathologist who testified that a fall would not have caused the injuries in question.

Second, the State used Lucio's "confession" to support the conclusion that she killed Mariah.  The State introduced the videos of Lucio's interrogation the first day of trial; the state court admitted the videos into evidence and they were immediately played for the jury.  The State later put Escalon on the stand, and he testified about Lucio's demeanor during the interrogation.  Escalon described Lucio's demeanor as indicating that she was saying, "I did it."  During its closing argument, the State characterized Lucio's admission as a "confession" that proved beyond a reasonable doubt that Lucio killed Mariah.  The State emphasized that Lucio "did make the statement and the statement that she made was the true and correct statement at the end.  She admitted it.  She admitted that she caused all of the injuries to that child."  The State also highlighted Lucio's demeanor during the interrogation, rhetorically asking why she would look or act a certain way if all she did "was physically beat the child, but didn't cause the death."  It also referenced Escalon's testimony that Lucio's demeanor indicated she was "hiding the truth."

Lucio tried to defend against both points.  First, she called a neurosurgeon who testified that the blunt force trauma causing Mariah's

No. 16-70027

death could have resulted from falling down stairs. During closing arguments, Lucio's counsel argued that the State failed to overcome reasonable doubt because evidence indicated that Mariah's fatal injury could have resulted from falling down stairs.

Second, Lucio wanted to present two expert witnesses to testify that her supposed confession was not trustworthy, but the state trial court did not let them testify. One of the experts was Dr. John Pinkerman, a psychologist who would have testified about Lucio's psychological issues that cause her to take "blame for everything that goes on in the family."[5] He formed his opinion after reviewing the interrogation tapes, meeting with Lucio on four occasions, reviewing her history, and administering various psychological tests to her. The state trial court prevented Pinkerman from testifying, not due to any lack of qualifications as an expert but because the judge considered the testimony *irrelevant* because Lucio "denied ever having anything to do with the killing of the child." The state trial court permitted Pinkerman to submit a bill of particulars, but the judge left the courtroom after swearing Pinkerman in, not waiting to listen to Pinkerman's proffer.

Beyond her medical expert and the two excluded experts, Lucio called one defense witness and recalled one of the State's witnesses. Lucio's defense witness was her sister, Sonia Chavez, who testified that Lucio "never disciplined her children." The recalled witness was Joanne Estrada, a child protective services worker. Estrada was asked about whether she had reviewed documents that showed that Mariah had tantrums while in foster care and had hit her head on the floor. Estrada testified that she had not come

---

[5] The other expert was Norma Villanueva, a licensed social worker with graduate education, who would have testified about why Lucio "would have given police [officers] information . . . that was not correct" to show that Lucio "admits to things that she didn't do."

across anything in Lucio's file that showed she was "physically abusive to any of the children." Lucio presented no other witnesses.

In closing argument, the State, citing only Lucio's interrogation statements as evidence, contended that Lucio must have killed Mariah because she abused her. It argued that "there [wa]s no reasonable doubt that [Lucio] killed that little girl" because the jury had "[h]er confession." Ultimately, Lucio was convicted and sentenced to death.

## B. Subsequent Appeals & Petitions For Post-Conviction Relief

Lucio appealed her conviction, raising several points of error, but the Texas Court of Criminal Appeals affirmed. *Lucio*, 351 S.W.3d at 910. On appeal, the State's argument continued to rely on Lucio's interrogation. In responding to Lucio's sufficiency of the evidence challenge, the State argued that a "jury could have reasonably concluded that [Lucio] was responsible for delivering the fatal blow to Mariah's head, as she had the opportunity to do so, *and she had admitted to a pattern of abuse that had continued for some two months*." *Id.* at 894–95 (emphasis added) (cleaned up). The Texas Court of Criminal Appeals accepted that argument. *Id.* at 895.

Lucio also claimed that the trial court's exclusion of Pinkerman's testimony violated her "constitutional right to present evidence before the jury as to the circumstances under which [a] confession is taken." She cited *Crane* for the proposition that a jury is "entitled to know about the circumstances under which [a] statement was given . . . so that [it] could assess the voluntariness of the statement." The Texas Court of Criminal Appeals rejected Lucio's challenge for two reasons: (1) Lucio's "claim on appeal as to what Pinkerman's testimony would have been d[id] not comport with what the trial attorney claimed . . . he was offering it for," and (2) Pinkerman's proffered testimony "had little, if any, relevance to a jury's voluntariness determination under state law." *Id.* at 902.

After Lucio lost on direct appeal, she sought state habeas relief. As with her direct appeal, she raised several arguments, including the argument that Pinkerman's testimony should have been admitted. This time, though, she distinguished her argument as going "to the core of the case—whether [Lucio] was likely to have engaged in ongoing abuse of Mariah." She stated that the issue was the deprivation of "the constitutional right to present a complete defense," and cited a state law case that relied on the U.S. Constitution for that right. Lucio also argued that her trial counsel provided ineffective assistance of counsel ("IAC"). Her habeas application offered a post-trial affidavit from Pinkerman as support. The state habeas court rejected all of Lucio's claims. It concluded that her complete defense claim was "nearly identical to [the issues] raised on direct appeal," and the additional evidence she presented did not demonstrate that she was entitled to relief. The state habeas court also concluded that the trial court "did not abuse its discretion in excluding" Pinkerman's testimony. His testimony, the state habeas court reasoned, "had no relevance to the question of [Lucio's] guilt or innocence."

Lucio appealed the state habeas court's decision. The Texas Court of Criminal Appeals adopted the habeas court's findings of fact and conclusions of law. It noted that some of the issues Lucio raised were procedurally barred, but it did not list her complete defense claim among them.

Lucio then petitioned for federal habeas relief under 28 U.S.C. § 2254 in federal district court and reasserted the complete defense claim she had raised before the state habeas court. The district court rejected the claim. It considered Pinkerman's testimony to be "only tangentially related to the question of Lucio's guilt or innocence" and noted that the "evidence that anyone but Lucio inflicted the fatal injuries is tenuous at best."

Lucio filed a timely notice of appeal, and we granted her a Certificate of Appealability ("COA") on her complete defense claim. *See Lucio v. Davis*, 783 F. App'x 313, 319 (5th Cir. 2019) (per curiam). A panel of this court reversed the district court's order denying her habeas petition on those grounds. *Id.* at 325. We granted en banc rehearing. *Lucio v. Davis*, 947 F.3d 331 (5th Cir. 2020) (mem.).

## II. The Issue Presented on Appeal

The issue on appeal is whether the district court erred in its adjudication of Lucio's complete defense claim. Before addressing the merits, I first explain what Lucio's complete defense claim is and explain why, contrary to the plurality opinion's contention, there are no other issues on appeal.

### A. Lucio's Complete Defense Claim

Lucio's complete defense claim is that her "right to present a complete defense [wa]s violated by the exclusion of [Pinkerman's testimony] pursuant to a state evidentiary rule that categorically and arbitrarily prohibits [her] from offering otherwise relevant, reliable evidence that is vital to h[er] defense." She cites *Wiley v. State*, 74 S.W.3d 399, 406–07 (Tex. Crim. App. 2002), to support her claim. Lucio claims that Pinkerman would have testified to Lucio's abuse and tendency to take blame for everything. She claims that Pinkerman's testimony would have attacked a key part of the State's case—that she physically abused Mariah—and was therefore vital to her defense. In other words, Lucio argues that the state trial court "stripped [her] of the power to describe to the jury the circumstances that prompted h[er] confession" and "effectively disabled" her from challenging the trustworthiness of her custodial confession that was on "every rational juror['s]" mind when they decided her guilt. *See Crane*, 476 U.S. at 689.

No. 16-70027

Lucio's complete defense claim has not changed since Lucio first raised it in state habeas court.[6] She argues that, if the state habeas court adjudicated her complete defense on the merits, then the state habeas court's holding was "an unreasonable application of the substantially similar decisions of *Chambers* and *Crane*."[7]

The plurality opinion contends that Lucio's mere "flagging" of *Wiley*, which cites the U.S. Constitution, is insufficient to raise a federal claim and, therefore, is nothing more than an invitation for us to second-guess the state court on the rules of evidence. Plurality Op. at 31. But Lucio did much more than cite *Wiley*: she clearly stated that "[t]he trial court deprived [her] of the constitutional right to present a complete defense"—which Texas does not appear to recognize or reject—and she did not mention state evidentiary

---

[6] The plurality opinion states that it "is an undisputed proposition" that Lucio changed her complete defense claim over time. Plurality Op. at 45. The record proves that proposition false. Lucio's complete defense claim—first raised in state habeas court—has not changed. In state habeas court, Lucio argued that the state trial court deprived her "of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial." In her federal habeas petition in district court, Lucio argued the same: that the state trial court violated her right to present a complete defense when it "Excluded the Testimony of Her Defense Experts During the Guilt/innocence Phase of Trial." In her request for a COA from us, Lucio alleged that it was "debatable that [she] was deprived of her due process right to present a defense when the trial court excluded the testimony of defense expert witnesses at the guilt/innocence phase of the trial." In her panel briefing, Lucio claimed that the trial court violated her right to present a complete defense because Pinkerman's testimony would have challenged the credibility of her incriminating statement. She made the same claim in her en banc briefing. This case is therefore distinguishable from *Rose v. Lundy*, 455 U.S. 509 (1982), which the plurality opinion cites for the proposition that defendants cannot "attempt[] to broaden [a state court] claim" in federal court; Lucio has repeatedly made the same claim, over and over, in every post-conviction setting. *See* Plurality Op. at 45.

[7] Lucio also argues that the state habeas court's adjudication was contrary to *Chambers*, *Crane*, and *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), and based on an unreasonable determination of the facts. Because the relevance determination turns on the facts as set forth herein, I do not address this issue separately.

rules or standards to support her claim.  Thus, Lucio does not ask us to act as a state court examining state evidentiary rules.  Indeed, the State agrees that this complete defense claim is the issue before us today.

The plurality opinion also contends that "Lucio adamantly insisted that her state habeas claim did not involve *Crane*" and thus her complete defense claim cannot implicate the case, either.  Plurality Op. at 30.  As explained above, Lucio cited *Crane* in her direct appeal for the proposition that a jury is "entitled to know about the circumstances under which [a] statement was given . . . so that [it] could assess the voluntariness of the statement."  In state habeas proceedings, Lucio clarified that her state habeas complete defense claim did not concern the *voluntariness* of her confession, which was her point on direct appeal.  But this distinction does not mean that we cannot consider *Crane* when assessing Lucio's complete defense claim; a case can support multiple, different arguments.

To see why this one does, it is worth taking a look at the case itself.  In *Crane*, the Supreme Court reiterated that due process "requires that a jury not hear a confession unless . . . it was freely and voluntarily given."  476 U.S. at 687–88 (internal quotation marks, alteration, and citation omitted).  That due process requirement was relevant to Lucio's argument on direct appeal.  But the *Crane* Court also held that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  476 U.S. at 690 (internal quotation marks and citation omitted).  That point supports Lucio's state habeas claim.  The reality that this second aspect of *Crane* is at play here appears to shock only the plurality opinion; again, the State understands that Lucio's complete defense claim may implicate the case.

Lastly, the plurality opinion contends that Lucio whipsawed the state courts with her complete defense claim because Pinkerman never proffered

at trial about the credibility of Lucio's interrogation statements. Plurality Op. at 34–35. But how could he have done so? The trial judge chose to leave and not hear the proffer, having already concluded that Pinkerman's testimony was "irrelevant" regardless.

The plurality opinion tries to nuance its whipsawing point by highlighting that Pinkerman signed an expert report before he was called to testify and the report never "hint[ed] that any of [Lucio's interrogation] statements were false." Plurality Op. at 35. But the whole point of Pinkerman's testimony was to *contextualize* Lucio's statements as *potentially* influenced by Escalon's questioning: the report observed that "[i]n times of significant stress, [Lucio] withdraws into simpler, concrete, unrealistic and constricted functioning marked by passivity, denial, acquiescence and resignation[,]" which is likely attributable to her experience with abuse. In that regard, the report noted that Lucio "tune[d] out" Escalon when he "raise[d] his voice" but then "eventually respond[ed] with resignation." The report thus corresponds to the reason why Lucio's trial counsel sought to introduce Pinkerman: it tended to show that Lucio would "take[] blame for everything that goes on in the family," including potentially covering for her husband, other children, or Mariah herself.

The plurality opinion further contends that Pinkerman's mitigation testimony failed "to hint[] that any of [Lucio's] statements were false." Plurality Op. at 35. Mitigation testimony comes after a jury has decided on a defendant's guilt. So, of course, Pinkerman's mitigation testimony did not concern Lucio's innocence (i.e., that Lucio likely made false statements in her interrogation). Indeed, when asked by the State whether he was testifying

that Lucio did not harm her child, Pinkerman responded that he was not "address[ing] the causation."[8]  There was no whipsawing.

In sum, the question we have been asked to answer is whether the state trial court violated Lucio's constitutional right to present a complete defense when it excluded Pinkerman's testimony about her propensity to take blame for everything from the guilt/innocence stage.  To the extent that we evaluate this question under AEDPA deference, the question becomes whether the state habeas court's exclusion of Pinkerman's testimony about her propensity to take blame for everything was an unreasonable application of *Crane* and *Chambers*.

## B.  Issues Raised Sua Sponte by the Plurality Opinion

The plurality opinion bases its affirmance on the complete defense issue largely on four issues that were never raised by either party.  The State has waived all four arguments and so our court should not consider them.

First, the plurality opinion contends that Lucio defaulted on her claim because she failed to raise it to the state trial court.  *See* Plurality Op. at 18–19.  In particular, it asserts that Pinkerman's bill of particulars was lacking in detail about the psychological pressure Lucio felt when she made her interrogation statements.  *See* Plurality Op. at 19.  On direct appeal, when Lucio made no IAC claim, the State argued this point.  It argued that Pinkerman's proffer was "broad and general," referring to only "the

---

[8] Specifically, the State asked: "were you under the understanding that someone else harmed her and all she did was failed to protect her?"  Pinkerman responded: "No. Again, I didn't address the causation.  What I'm trying to think that any mother would have looked to that pattern of abuse—and in a normal situation, a normal mother would have protected the child."

characteristics and makeup of [Lucio's] psychological functioning" and her demeanor.

But the State intentionally waived this procedural default in state habeas court. Why? Well, in those proceedings, Lucio raised an IAC claim that her trial counsel had provided ineffective assistance by failing to adequately utilize Pinkerman; Lucio claimed that Pinkerman "could have assisted trial counsel in developing evidence that [her] history provided 'little support for the idea that [she] physically abused her children' to support the defense theory during guilt/innocence." The State clearly made a strategic call not to reassert any failures in Pinkerman's bill of particulars because doing so would effectively concede the legitimacy of Lucio's IAC claim. The State instead went in a different direction, arguing that Pinkerman's bill of particulars "indicated that he would testify as to . . . how there was little support in the 'historical record' for the idea that [Lucio] physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning." Given the switch in argument, it is plain that the State has waived its procedural default argument in these federal habeas proceedings.

Second, the plurality opinion contends that, to the extent that Lucio's direct appeal claim is "nearly identical" to Lucio's complete defense claim, Lucio's complete defense claim is procedurally barred because Lucio failed to raise her claim in state trial court. *See* Plurality Op. at 13, 19. But the State also waived this procedural default. If, as the plurality opinion contends, Lucio's complete defense claim from state habeas is the same as her claim on direct appeal, *see* Plurality Op. at 19, then the State's response in state habeas proceedings to Lucio's complete defense claim could have been one sentence: As the Texas Court of Criminal Appeals held, Lucio's complete defense claim is procedurally barred because she failed to raise it in state trial

court.  The State's response was nothing of the sort, and the State has never brought the issue up in any later proceeding.

Third, the plurality opinion contends that Lucio's claim is procedurally barred because the state habeas court held that she had attempted to raise the same argument from direct appeal in her state habeas proceeding.  *See* Plurality Op. at 13, 20.  But the state habeas court did not come to that conclusion.  What it did was observe that Lucio's complete defense claim was "nearly identical" to her direct appeal claim and that it thus did not have to relitigate it.  But, because "additional evidence," here, Pinkerman's affidavit, "may warrant relief even when the issue was raised on direct appeal," the state habeas court did not rely on a procedural bar.  Consistent with that reading, the Texas Court of Criminal Appeals, in adopting the state habeas court's findings and conclusions, determined that the state habeas court did not hold Lucio's complete defense claim as procedurally barred.  What's more, the State has waived this putative procedural bar, too.  Indeed, the State (which drafted this exact finding of fact and conclusion of law on this point for the state habeas trial court) has explicitly argued to the contrary, stating in its en banc brief: "The state court did not deny Lucio's complete-defense claim on procedural grounds."

Fourth, the plurality opinion states that Pinkerman's post-trial affidavit cannot be considered because it was not before the Texas Court of Criminal Appeals on direct appeal.  *See* Plurality Op. at 29–30.  Not only did the State again waive this argument, but it did so expressly and unequivocally in response to our court's direct question.  In response to our en banc Q&A— "whether we may also consider Dr. Pinkerman's 2010 affidavit . . . in deciding whether exclusion of his guilt phase testimony was an unreasonable application of clearly established Supreme Court precedent"—the State answered, "Yes, . . . *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011), indicates

that this Court may also consider Dr. Pinkerman's 2010 affidavit because it was part of the record in the state court."

Even if the State had not clearly waived these arguments (which, as discussed, it did), the plurality opinion errs in making these four procedural holdings sua sponte. As the Supreme Court recently reminded the circuit courts: "In our adversarial system of adjudication, we follow the principle of party presentation." *Sineneng-Smith*, 140 S. Ct. at 1579 (citation omitted). Thus, "in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (quotation omitted). Departures from this principle are usually only warranted in criminal cases when doing so would "protect a *pro se* litigant's rights." *Id.* (quotation omitted). This is not one of those cases; Texas is the largest state in our circuit and our second-biggest litigant. Its Attorney General's office is chock-full of excellent attorneys who do nothing but habeas work. This court should not be making arguments on the State's behalf, especially in a capital case.

If the Supreme Court's admonition were not enough, our precedent also restrains us from doing so in this very context. When dealing with procedural bars, we have held that "even if we do have discretion in some circumstances to apply the procedural bar where the state has waived the defense[,] . . . we will not exercise such discretion" when:

(1)    "the habeas petitioner has [not] been given notice that procedural default will be an issue for consideration," and

(2)    "the petitioner has [not] had a reasonable opportunity to argue against the application of the bar;" or

(3)    "the state intentionally waived the defense."

*Fisher v. Texas*, 169 F.3d 295, 301–02 (5th Cir. 1999).[9] Here, deciding Lucio's fate on procedural bars that the State never raised denies Lucio notice and a reasonable opportunity respond. Further, the State intentionally waived three of these procedural default arguments.

The issue with the plurality opinion's sua sponte holdings is not merely academic: had the State taken a different tactic in the state habeas proceeding and beyond, then Lucio would have had an excellent IAC claim. Instead, the state habeas court denied that claim, as did the federal district court, and we denied a COA. If we are going to ignore the Supreme Court's admonition in *Sineneng-Smith*, step in on our own initiative, and decide to redo the State's strategic decisions to make the focus on whether the trial attorney properly presented a bill of particulars, well, then, we need to start over on the IAC issue too. If Lucio is to be executed because her lawyer did not make a perfect bill of particulars, that certainly sounds like she suffered ineffective assistance and prejudice.

Rather than decide this case on procedural arguments that the State itself has waived and that Lucio had no idea we would raise on our own, I

---

[9] Indeed, we have yet to apply a procedural bar sua sponte in a habeas case when the petitioner lacked notice and a reasonable opportunity to respond or when the State intentionally waived the defense. *See, e.g.*, *Fisher*, 169 F.3d at 302 (declining to apply a procedural bar sua sponte because petitioner lacked notice and had no reasonable opportunity to respond). *But see, e.g.*, *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000) (applying a procedural bar sua sponte because petitioner was given notice and an opportunity to respond and the State did not intentionally waive the defense); *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000) (per curiam) (concluding that it was appropriate to apply a procedural bar sua sponte because petitioner had notice and an opportunity to respond and the State did not intentionally waive the bar); *Magouirk v. Phillips*, 144 F.3d 348, 360 (5th Cir. 1998) (holding that the federal district court did not abuse its discretion in raising a procedural default sua sponte because petitioner had notice and a reasonable opportunity to respond and the State did not intentionally waive the defense). The plurality opinion does not explain why we should reject this clear precedent as to when it is appropriate to raise procedural default issues sua sponte.

respectfully submit that we should address the one issue that is actually before us—Lucio's complete defense claim raised in state habeas court—based on the entire state record. Accordingly, I proceed to address the merits of Lucio's complete defense claim.

### III. Discussion

To prevail on her complete defense claim, Lucio must satisfy the statutory requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, we review Lucio's complete defense claim de novo if (1) Lucio exhausted her claim in state court, 28 U.S.C. § 2254(b), and (2) the state court failed to adjudicate that claim on the merits, 28 U.S.C. § 2254(d). *See also Johnson v. Williams*, 568 U.S. 289, 303 (2013). If the petitioner failed to present a federal claim in state court, then the claim is dismissed. If the petitioner did present a federal claim in state court and the state court adjudicated the claim on the merits, then AEDPA's deferential standard under § 2254(d) applies.

Under § 2254(d), relief will not be granted unless the state court's adjudication of the federal claim was "contrary to . . . clearly established Federal law, as determined by the Supreme Court," "an unreasonable application of" that law, or "was based in an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The plurality opinion holds that AEDPA deference applies, *see* Plurality Op. at 21, and that Lucio's complete defense claim fails to satisfy § 2554(d), Plurality Op. at 21–41. As mentioned above, several of the judges joining in this dissenting opinion concur in the now-vacated panel's viewpoint that the state habeas court failed to adjudicate Lucio's complete

No. 16-70027

defense on the merits.[10]  However, because the majority of the en banc court has ruled that Lucio's complete defense claim has been exhausted and adjudicated on the merits, I address her claim under AEDPA deference.[11] Even under AEDPA's deferential standard of review, however, the state habeas court's adjudication of Lucio's complete defense claim "involved an unreasonable application of" *Crane* and *Chambers*.  *See* 28 U.S.C. § 2554(d)(1).  First, I will summarize those cases, and then I will discuss why the state court's determination is an unreasonable application of those key precedents.

### A. *Crane*

In *Crane*, the Supreme Court recognized that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," and held that such an "opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence."  476 U.S. at 690 (internal quotation marks and citations omitted).  The Court thus concluded that the state court's

---

[10] Those of us who adhere to this viewpoint would, absent the en banc conclusion to the contrary, conclude that the state habeas court failed to adjudicate Lucio's complete defense claim on the merits because it erroneously determined that Lucio raised a state evidentiary challenge and rejected that claim based on state evidentiary standards.  There is a rebuttable presumption that state courts have rejected a claim on the merits if a written order is silent regarding a claim.  *See Williams*, 568 U.S. at 300–01.  But Lucio rebuts this presumption because the state evidentiary standard is "less protective" than the federal standard for a complete defense claim.  *Id.* at 301; *see Wiley*, 74 S.W.3d at 405 (recognizing that a complete defense claim asserts that the exclusion of "otherwise relevant, reliable evidence" precluded the defendant from presenting a defense).

[11] Granted, if the state habeas court's decision on Lucio's complete defense claim was error under AEDPA deference, then it was also error under de novo review.  Thus, there is nothing inconsistent, as the plurality opinion contends, about applying arguendo a more deferential standard of review when Lucio should prevail either way.

exclusion of testimony related to the "environment" in which the police secured the defendant's confession violated the defendant's right to present a complete defense. *Id.* at 691.

The underlying proceedings in the case bring the issue into focus. In particular, the state court had excluded the testimony because it "related solely to [the] voluntariness" of the defendant's confession and state evidence rules prohibited relitigation of a trial court's pretrial voluntariness determination. *See id.* at 686–87 (citation omitted). Given its voluntariness holding, the state court further held that the testimony "did not relate to the credibility of the confession." *Crane v. Kentucky*, 690 S.W.2d 753, 755 (Ky. 1985).

The Supreme Court disagreed with the state court's separation of those concepts, taking issue with its holding "that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility f[e]ll in conceptually distinct and mutually exclusive categories." *Crane*, 476 U.S. at 687. It reiterated its precedent that "evidence surrounding the making of a confession bears on its credibility as well as its voluntariness." *Id.* at 688 (internal quotation marks and citation omitted). The Court thereby held that evidence on the circumstances of Crane's confession was particularly relevant because Crane's "entire defense was that there was no physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission of guilt was not to be believed." *Id.* at 691. Therefore, the Court concluded it was "plain that introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance" of Crane's defense succeeding. *Id.* The evidence would help answer "the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id.* at 689. In other words, the Court held that the evidence was indispensable to Crane's defense.

No. 16-70027

Further, in holding that the state court violated Crane's right to present a complete defense, the Court determined that it was not a case where the state court excluded the evidence for "fairness [or] reliability" issues. *Id.* at 690. The state court failed to "advance[] any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence." *Id.* at 691.

## B. *Chambers*

In *Chambers*, the Supreme Court held that the exclusion of hearsay evidence under a state hearsay rule and the refusal to allow the defendant to cross-examine a key witness under a state voucher rule violated the defendant's right to present a complete defense. 410 U.S. at 302–03.

The facts of the case illustrate the contours of its rule. Chambers and three of his friends (James Williams, Berkley Turner, and Gable McDonald) were involved in a shooting, for which Chambers was convicted of murder. *Id.* at 285–87. At his trial, Chambers sought to prove that he did not shoot the victim but that McDonald did. *Id.* at 289. Chambers called McDonald as a witness to testify that McDonald had written a confession stating that he shot the victim. *Id.* at 291. On cross-examination, the State elicited from McDonald that he repudiated his prior confession. *Id.* When Chambers attempted to examine McDonald as an adverse witness, the state court denied Chambers's request under the state "voucher" rule that prevented him from impeaching his own witness. *Id.* at 291, 295. To challenge McDonald's renunciation of his prior confession, Chambers then sought to introduce testimony from three witnesses to whom McDonald had admitted shooting the victim. *Id.* at 292. All three witnesses were prevented from testifying under state hearsay rules. *Id.* at 292–93, 295.

In sum, Chambers was prevented from presenting evidence that McDonald shot the victim. *Id.* at 294. Such evidence, the Court held, was

"critical to Chambers' defense." *Id.* at 302. The Court also held that the state court's reason for its evidentiary decisions were irrational, taking issue first with the voucher rule in its entirety as an "archaic, irrational" rule that was "potentially destructive of the truth-gathering process." *Id.* at 296 n.8. The state court's *application* of the hearsay rules was also irrational: the hearsay statements, the Court concluded, were "well within the basic rationale of the exception for declarations against interest" and therefore had a "considerable assurance of their reliability." *Id.* at 300, 302. Because the evidence was vital to Chambers's defense and the state court's reasons for excluding the testimony were irrational, the Supreme Court held that the state court violated Chambers's right to present a complete defense.

### C. Application of *Crane* and *Chambers* to Lucio

"A state court's decision constitutes an unreasonable application of clearly established federal law if it is 'objectively unreasonable.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted). Lucio satisfies this high threshold.

The Supreme Court in *Crane* and *Chambers* made clear that a state court violates a defendant's right to present a complete defense if (1) the excluded evidence was critical to the defense, *Crane*, 476 U.S. at 689, 691; *Chambers*, 410 U.S. at 302, and (2) the state court failed to provide a rational justification for its exclusion, *Crane*, 476 U.S. at 689, 690–91; *Chambers*, 410 U.S. at 296 & n.8, 302. Here, Pinkerman's testimony was critical to Lucio's defense because it was the centerpiece of her attempt to challenge the trustworthiness of her interrogation statement. Moreover, the state trial

court provided no reason why the testimony was irrelevant and all indications are to the contrary, making its exclusion irrational.

### 1. *Pinkerman's Testimony Critical to Lucio's Defense*

Pinkerman would have testified that Lucio "takes blame for everything that goes on in the family. . . [and] for everything that goes on in the house." That tendency had implications for her interrogation: it was Pinkerman's "professional opinion [that Lucio's] psychological characteristics increase[d] the likelihood she would acquiesce while providing her confession." In other words, Pinkerman would have testified that Lucio's interrogation statement, including her abuse of Mariah, posed "serious questions" about its validity.

Pinkerman's excluded testimony was indispensable to Lucio's defense because it rebutted the State's most critical evidence of Lucio's guilt: Lucio's interrogation statement.[12] The State presented no physical evidence or witness testimony establishing that Lucio abused Mariah or any of her children, let alone killed Mariah. Instead, it used Lucio's interrogation statement as its crucial source of proving she committed the act. In closing argument, the State contended that Lucio must have killed Mariah because she abused her. The only evidence it cited in closing to establish that Lucio abused her was Lucio's "confession." On appeal, when the State argued that

---

[12] The plurality opinion suggests that the State had Lucio's phone call to her sister as additional evidence of her guilt. *See* Plurality Op. at 12. But that was not part of the State's argument at trial. *See supra* Section I.A. Indeed, the State made no mention of Lucio's conversations with her sister in its closing argument. As Lucio's trial counsel noted: "This whole case revolve[d] around th[e] video."

The State also argues that Pinkerman's testimony was not indispensable because Lucio could have presented "fact witnesses to testify about her body language, her propensity to take blame, or any other issue." But that is exactly what Pinkerman sought to testify about and, as explained below, the state habeas court provided no rational justification for excluding Pinkerman's testimony.

the evidence was sufficient to convict Lucio, it again relied on the assertion that Lucio "admitted to a pattern of abuse." *See Lucio*, 351 S.W.3d at 894–95. In short, the interrogation statement played a pivotal role in the State's case.

If the interrogation statement is taken away—or its validity is undermined—then the State's case becomes much more tenuous, demonstrating both its criticality and the irrationality of excluding Pinkerman's contextualizing testimony as "irrelevant."[13] A reasonable juror would have much less reason to assume that Lucio—rather than her husband, other children, or Mariah herself—caused Mariah's injuries. To the extent that there was evidence beyond Lucio's statement that implicated her—such as opportunity based upon being Mariah's primary caretaker—it pales in comparison to the force of an alleged confession. Thus, as critical as that evidence was to the State, explaining why it could not be trusted was just as critical to Lucio's defense.[14]

---

[13] The State's best alternate evidence is a statement from a police officer that, after Lucio's arrest and while the officer was driving, Lucio used the phone to call her sister. According to the officer, Lucio told her sister, "Don't blame, Robert. This was me. I did it. So don't blame Robert." But this phone statement could well have stemmed from Lucio's tendency to take blame for everything in the family, which the excluded expert evidence was intended to addressed. Further, this evidence does not come close to the power of Lucio's interrogation statements, which went unchecked. The officer's statement is also subject to attack. For example, he did not create a log of the incident until the month before trial, nearly sixteen months after Lucio allegedly made the statement. The statement also lacks context, which makes it less reliable.

[14] The plurality opinion claims that "the trial court permitted Lucio's sister to testify about Lucio's . . . tendency to take the blame for things she did not do," but provides no support for this claim. Plurality Op. at 26. Nor could it; Lucio's sister said nothing at all about Lucio's tendency to take the blame for anything.

In addition, the plurality opinion and the State argue that Pinkerman's testimony was not vital to Lucio's defense because Pinkerman's testimony at the mitigation stage never hinted that Lucio's statements could not be trusted. Plurality Op. at 35–36. But, as explained *supra* Section II.A., Pinkerman's mitigation testimony holds no bearing on

No. 16-70027

In sum, the indispensability of Pinkerman's testimony to Lucio's defense is on par with the excluded evidence at issue in *Crane* and *Chambers*. Like Crane's excluded evidence, Pinkerman's testimony related to the credibility of Lucio's confession. *See Crane*, 476 U.S. at 688. Like Chambers's excluded evidence, Lucio had no other means to present evidence to refute the State's reliance on her interrogation statement. *Chambers*, 410 U.S. at 294. Thus, Pinkerman's testimony was "all but indispensable to any chance of [Lucio's] succeeding."[15] *Crane*, 476 U.S. at 691. Moreover, as in *Crane*, the credibility of Lucio's "confession" was the focus of the jury's question as to her guilt. *See id.* at 689. Without Pinkerman's testimony as to why Lucio would have confessed to abusing her daughter if she did not actually do so, the "question every rational juror need[ed] answered"—if she was innocent, why did she say all those things during her interrogation?—was left unaddressed. *Id.* Consequently, Pinkerman's excluded testimony was vital for Lucio's defense.

## 2. *State Trial Court's Unreasonable Application*

The exclusion of Pinkerman's testimony bears hallmark signs of irrationality such that the state court's ruling was an unreasonable application of Supreme Court precedent. The state habeas court excluded Pinkerman's testimony on relevance grounds.[16] It concluded

---

Lucio's tendency to take blame for everything because the jury had already determined that Lucio was guilty.

[15] As explained above, Lucio's sister did not testify regarding Lucio's tendency to take blame for everything. *See supra* n.14.

[16] The State asserts that the state habeas court rejected Pinkerman's testimony as unreliable and as failing to qualify as an expert testimony under Texas Rule of Evidence 702. The state habeas court made no determination about the reliability of Pinkerman's testimony, nor did it make a determination about Pinkerman's qualification as an expert to testify.

that Pinkerman's "testimony as to [Lucio's] psychological functioning, including how there was little support in the 'historical record' for the idea that [she] physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning had no relevance to the question of [her] guilt or innocence." It thus held that the state trial court did not "abuse its discretion" in excluding Pinkerman's testimony. That is the entirety of the state habeas court's reasoning on the matter. In other words, Pinkerman's testimony was indispensable to Lucio's defense, as explained above, and the state habeas court provided no reason why Pinkerman's testimony was irrelevant as to the credibility of Lucio's confession.

The plurality opinion contends that the Supreme Court's holding in *Crane* does not permit a defendant to admit evidence that a state court excluded through a state evidence rule that "serve[s] the interests of fairness and reliability." *See* Plurality Op. at 23 (quoting *Crane*, 476 U.S. at 689). Indeed, that is true. But, like the state court in *Crane*, the state habeas court here did not exclude Pinkerman's testimony based on any rational application of a state evidence rule, even assuming the rule itself serves an interest of fairness or reliability.[17] *See Crane*, 476 U.S. at 690–91. Rather, the state habeas court held that the state trial court did not abuse its discretion in excluding Pinkerman's testimony because it was irrelevant and had no bearing on Lucio's guilt. That is essentially what happened in *Crane*, where the state court had held that the excluded testimony about the "environment" surrounding the defendant's confession was irrelevant because it had no bearing on the confession's credibility. *See id.* at 687–88. But the Supreme Court did not defer to the state court's holding on that

---

[17] There was no *Daubert*-like inquiry into the reliability of Pinkerman as an expert witness. Only Villanueva's reliability was questioned.

point.  It independently determined that the excluded testimony bore on the credibility of the defendant's confession and was relevant to the defense's theory that his confession could not be trusted.  *See id.* at 688–89.  In determining whether the state habeas court's exclusion of Pinkerman's testimony was an unreasonable application of *Crane*, then, we must also determine whether his testimony was relevant and vital to Lucio's defense.  As explained above, Pinkerman's testimony was clearly relevant and vital to Lucio's defense.  It would have "answer[ed] the one question every rational juror needs answered: If [Lucio] is innocent, why did [s]he previously admit h[er] guilt?"  *See id.* at 689.  Thus, the state habeas court's exclusion of the testimony as irrelevant was unreasonable and served no fairness or reliability interest.

The plurality opinion also contends that the state habeas court did not unreasonably apply *Crane* or *Chambers* because those cases concerned categorical, not discretionary, evidence rules.  Plurality Op. 26–27, 33.  In that regard, the plurality opinion claims that we would create a circuit split because five circuit courts have observed that *Crane* did not implicate discretionary evidence rules.  Plurality Op. at 27–29.

But neither *Chambers* nor *Crane* holds that a defendant's right to present a complete defense applies only when a state court excludes evidence based on categorical evidentiary rules.  *See Crane*, 476 U.S. at 690 (holding that an opportunity to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence"); *Chambers*, 410 U.S. at 302 (making no limitation that its holding—that the exclusion of critical evidence violated the defendant's right to present a complete defense—applied to only categorical evidence rules).  The only support for the plurality opinion's narrow

interpretation of *Chambers* and *Crane* comes from (a) one line in *Crane*, which states "that the *blanket* exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial," *Crane*, 476 U.S. at 690 (emphasis added); and (b) the fact that the evidentiary rules at issue in those cases were categorical and non-discretionary. However, as the plurality opinion recognizes, the Supreme Court has since explained that the core "principle" of *Crane* is unrelated to either of those two points: rather, *Crane* establishes that the right to present a complete defense is violated when a state trial court excludes competent, reliable evidence without providing a valid reason. *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996); *accord* Plurality Op. at 23–24. Further, the fact that the evidentiary rules at issue in *Crane* and *Chambers* were categorical would only matter if we were debating whether the state habeas court's adjudication was "contrary to" Supreme Court precedent, but that is not the situation here, as we are only analyzing its *application* of that precedent. *See Boyer v. Vannoy*, 863 F.3d 428, 441 (5th Cir. 2017) (explaining when a state court's decision is contrary to clearly established federal law); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (stating that an "unreasonable application" under AEDPA deference includes an unreasonable application of "even a general standard").

The clearly established, general principle that we are evaluating today is straightforward: whether Lucio's right to present a complete defense was violated when the state trial court excluded Pinkerman's testimony without providing a valid reason. *See Egelhoff*, 518 U.S. at 53; *see also supra* Section III.C. The answer, as articulated above, is "Yes." In *Crane*, the Supreme Court held that the defendant's right to present a complete defense was violated because the state court's "sole rationale for the exclusion (that the evidence did not relate to the credibility of the confession) was wrong." *See Egelhoff*, 518 U.S. at 53 (internal quotation marks and citation omitted). Same here. The state trial court's "sole rationale for the exclusion" of

No. 16-70027

Pinkerman's testimony (that the evidence was irrelevant to Lucio's innocence) was irrational and wrong. Thus, in the words of the plurality opinion, Supreme Court precedent "positively precludes the state court from holding what it held." *See* Plurality Op. at 52.

Moreover, even if the plurality opinion is right and *Crane* and *Chambers* apply only to categorical rules, just such a categorical rule was applied here: to the extent that the state habeas court determined that the state trial court did not abuse its discretion in excluding Pinkerman's testimony under Texas Rule of Evidence 402,[18] that rule provides trial courts no discretion to admit or exclude irrelevant evidence. *See* TEX. R. EVID. 402 ("Irrelevant evidence is not admissible."); *cf. Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009) (holding that a California expert testimony rule differed from the categorical evidence rules at issue in *Crane* and *Chambers* because the California rule "d[id] not require a trial court to exclude evidence"). In that regard then, using the plurality opinion's reading of the state court's decision, the state trial court "mechanistically" applied the state's less protective relevant evidence rule "to defeat the ends of justice."[19] *See Chambers*, 410 U.S. at 302.

Lastly, the plurality opinion's fear of creating a circuit split is unfounded. *See* Plurality Op. at 27–29. The plurality opinion cites the Sixth, Eighth, Ninth, Tenth, and Eleventh circuits as holding that a state court's

---

[18] The state trial court's reason for excluding Pinkerman's testimony did not specify the evidentiary rule it applied, stating only: "I am having a hard time figuring out how [Pinkerman's testimony] goes to the guilt or innocence." But, the plurality opinion contends that the state trial court applied Texas's relevance rule, Rule 402, *see* Plurality Op. at 18, and this opinion does as well for argument sake.

[19] Although the plurality opinion observes that the question of relevance is discretionary, once relevancy is determined, I note that the exclusion of that evidence (if deemed irrelevant) is not.

conclusion that an application of a discretionary rule does not violate a defendant's right to present a complete defense is not an unreasonable application of *Crane*. However, only the Ninth Circuit did what the plurality opinion says it did. *See Moses*, 555 F.3d at 758–59 (holding that "the state appellate court's determination that the trial court's exercise of discretion to exclude expert testimony under [a state expert testimony rule] did not violate Moses's constitutional rights" was not an unreasonable application of *Crane* because *Crane* did not "squarely address . . . a court's exercise of discretion to exclude expert testimony"). The Sixth Circuit independently determined that the excluded evidence at issue was not probative, that is, not critical to the defense, *see Gange v. Booker*, 680 F.3d 493, 515–16 (6th Cir. 2012) (en banc), and determined that the state court provided a rational justification for excluding the evidence, *see Loza v. Mitchell*, 766 F.3d 466, 485–86 (6th Cir. 2014) (observing that the state trial court explained why the excluded evidence was not vital to the defense). Similarly, the Eighth, Tenth, and Eleventh Circuits held that the excluded evidence was not vital to the defense. *Rucker v. Norris*, 563 F.3d 766, 770 (8th Cir. 2009) (the excluded evidence was cumulative); *Grant v. Royal*, 886 F.3d 874, 957, 960 (10th Cir. 2018) (same); *Troy v. Sec'y, Fla. Dep't of Corr.*, 763 F.3d 1305, 1316 (11th Cir. 2014) (the excluded evidence provided "entirely speculative" testimony). Recently, the Seventh Circuit held that a state trial court's exclusion of the defendant's testimony as irrelevant (the same reason the state trial court gave for excluding Pinkerman's testimony) was an unreasonable application of *Crane* because the testimony was critical to the defense and its exclusion was arbitrary. *Fieldman v. Brannon*, 969 F.3d 792, 802–09 (7th Cir. 2020).[20]

---

[20] In explaining the requirements to obtain relief under AEDPA deference, the Seventh Circuit summarized and applied the legal standard for the "unreasonable application" prong under § 2254(d)(1). *See Fieldman*, 969 F.3d at 802, 809 (summarizing *Panetti*, 551 U.S. at 953). Thus, although the court in *Fieldman* wrote that the state trial

No. 16-70027

Rather than support the plurality opinion's circuit-split thesis, these cases actually contradict its argument that *Crane* prohibits courts from independently determining whether excluded evidence is relevant and vital to the defense as part of deciding the complete defense question. *See* Plurality Op. at 27–29.

The plurality opinion is also wrong that, if we applied *Crane* and *Chambers* to a discretionary rule (which, again, this opinion does not), we would *create* a circuit split by disagreeing with the Ninth Circuit. The Second Circuit has held that a state court unreasonably applied *Crane* on evidence subject to a trial court's discretion. *See Scrimo v. Lee*, 935 F.3d 103, 112, 115 (2d Cir. 2019) (holding that the state trial court's exclusion of witness testimony as extrinsic evidence on a collateral matter, a discretionary rule, was an unreasonable application of *Crane* and *Chambers*).[21] We have as well. *See Kittelson v. Dretke*, 426 F.3d 306, 310, 319–21 (5th Cir. 2005) (per curiam) (holding that a state trial court's discretionary limitation on cross-examination was an unreasonable application of complete defense precedents). Therefore, even if this case concerned a "discretionary evidence rule" (which it does not), our holding that the state habeas court unreasonably applied *Crane* and *Chambers* would not create a circuit split— the Ninth Circuit has already done so with a decision inconsistent with seven other circuits, including ours.

---

court's adjudication was "contrary to" clearly established law, the holding was in fact based under the "unreasonable application" prong.

[21] The plurality opinion contends that *Scrimo* does not support our position, but the plurality opinion misses the point. *See* Plurality Op. at 56–57. I identify *Scrimo* for the proposition that this opinion's position—that an unreasonable application of *Crane* is not limited to evidence subject to categorical evidence rules—would not create a circuit split.

108

No. 16-70027

## IV. Conclusion

Pinkerman's testimony on Lucio's susceptibility to take blame for everything was critical to refuting the State's primary evidence of her guilt: Lucio's interrogation statements. The state habeas court's rejection of Lucio's complete defense claim as irrelevant was irrational and an unreasonable application of *Crane* and *Chambers*. I would thus reverse the district court's order and remand for the district court to grant Lucio relief. Accordingly, I respectfully dissent from the decision to affirm.

No. 16-70027

STEPHEN A. HIGGINSON, *Circuit Judge*, joined by STEWART and ELROD, *Circuit Judges*, dissenting:

If we are to accept the death penalty as a practice, the Supreme Court has been exactingly clear that it is applied only to those whose cases leave no doubt that they are deserving of the ultimate punishment.

I write separately for emphasis, an opportunity made possible by the comprehensiveness of Judge Haynes's opinion, which I gratefully join, albeit with the caveat kindly noted in her third footnote. My emphasis is about what this case is, and what it is not.

It *is* a death penalty case with one issue, namely Ms. Lucio's effort to respond to the government's insistence at trial that she confessed five hours into interrogation to killing her child.[1] Legally, it *is* a case whose resolution should be controlled by the Supreme Court's unanimous ruling in *Crane v. Kentucky* that the due process clause's guarantee of an opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Fieldman v. Brannon*, 969 F.3d 792, 2020 WL 4670875 (7th Cir. Aug. 12, 2020).

---

[1] Ms. Lucio's comments arose out of the reality that Mariah was also a victim of Texas's broken foster care system. The Texas Department of Family Protective Services ("DFPS") removed all of Ms. Lucio's children from her care in September, and then returned them, including Mariah, two months later; Mariah died in February. *See Stukenburg v. Abbott*, 907 F.3d 237, 256–68 (5th Cir. 2018) (finding that the State was deliberately indifferent to the substantial risk that children in the Texas foster care system would be exposed to serious harm such as physical, sexual, and psychological abuse given that it was "aware of the systemic deficiencies plaguing its monitoring and oversight practices" and did not "take[] any steps at all" to address them).

Indeed, we are controlled by the Supreme Court's verbatim vindication of the constitutional imperative that a capital defendant's answer must be heard as to why, during government interrogation, without counsel present, she incriminated herself. *Crane*, 476 U.S. at 689 ("[S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?").

On the other hand, what this case is *not* is a criminal prosecution where the execution should proceed because, contrary even to Texas's arguments, we say constitutional error was forfeited, waived, shifted, or, in the words of the court, "radically shifted," causing injury to "whipsaw[ed]" and "sandbagg[ed]" state courts.[2] From the first, Ms. Lucio only had one answer to the prosecutor's insistence that she was guilty because she said she was. Yet the trial court excluded that answer on a ground so indefensible that neither the plurality nor Texas defends it, namely that Ms. Lucio "denied ever having anything to do with the killing of the child," making evidence about the circumstances of her confession irrelevant. Even if that reason for exclusion were not counterfactual, under *Crane*, "the physical and psychological environment that yielded [Ms. Lucio's] confession" is of

---

[2] Notably, Texas agreed before the district court that the issue was preserved, conceding that "Lucio raised [her claim that Villanueva and Pinkerman were improperly excluded] in state habeas proceedings." Even in its most recent briefing to our full court, Texas stated that "Lucio's state habeas application presented a specific complete-defense claim: The trial court violated her right to present a complete defense when it excluded her expert testimony as irrelevant because 'the evidence at issue here was not irrelevant to the issue of [her] guilt or innocence.'" Unmistakably, therefore, it is our court, and only at the en banc stage, that erects procedural bars against a capital defendant's constitutional claim being considered on the merits. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (reiterating the importance of "party presentation" and emphasizing that courts should function as "essentially passive instruments of government" (citation omitted)).

"substantial relevance to the ultimate factual issue of [Ms. Lucio's] guilt or innocence," especially because the State rested its case on that very confession. *Id.*; *Fieldman*, 2020 WL 4670875, at *8.

Furthermore, this is *not* a case about "extending" *Crane*'s imperative that a capital defendant's answer to self-incrimination during interrogation is inherently relevant information for the jury to consider. Very specifically, it is *not* about constitutionalizing expert opinion testimony admissibility. As the facts of *Crane* demonstrate, fact testimony or other evidence about Ms. Lucio's circumstances bearing on the credibility of her confession, situational and dispositional, could have taken the place of the proposed expert testimony offered. *Crane*, 476 U.S. at 688 ("'[E]vidence surrounding the making of a confession bears on its credibility' as well as its voluntariness." (quoting *Jackson v. Denno*, 378 U.S. 368, 386 (1964))). The fundamental problem is not the form of evidence excluded, but that the trial judge applied an indefensible "blanket exclusion" of Pinkerman's testimony by deeming it irrelevant without providing any "rational justification" for its exclusion. *Id.* at 690–91. Stated otherwise, the trial judge never reached any issue relating to the admissibility of Pinkerman's testimony as expert opinion. The exclusion of Ms. Lucio's evidence was a threshold irrelevancy one.[3] *Fieldman*, 2020 WL 4670875, at *11.

A battered woman was convicted of capital murder because, in a case lacking direct evidence, prosecutors told the jury that, five hours into interrogation, in the middle of the night after the discovery of her dead child, Ms. Lucio accepted a seasoned interrogator's suggestion that she was responsible, ultimately agreeing with him that she "did it." The jury's best

---

[3] By contrast, the trial judge did consider Villanueva's testimony and determined that she was not qualified as an expert. Right or wrong, we must defer to that ruling.

No. 16-70027

proof of guilt was Ms. Lucio's eventual capitulation blaming herself.[4] That may be appropriate inference and argument, but what violates our

---

[4] As Judge Haynes highlights, Ms. Lucio for hours proclaimed her innocence. About three hours into the interrogation, however, responding to suggestive questions and after viewing dozens of photographs of the child, she acquiesced:

Texas Ranger:  Explain it [t]o us. Ok?

Ms. Lucio:  I mean I would spank her, but I didn't think I would spank her, to where . . . to where it got to this point.

Texas Ranger:  Cause you were mad?

Ms. Lucio:  No. I mean I never took out my anger on my kids. I never did.

Texas Ranger:  Ok. Frustration? [Melissa nods head no]. Melissa. I'm being straight with you. And I need you to be completely honest with me. ok? It's just you and I. ok? I'm meeting you halfway. ok? . . . Ok? . . . it's ok. . . . You did it? Who did it?

Ms. Lucio:  I did.

Texas Ranger:  Ok. You did? Did the world stop moving? No. . . . It's for your own good. . . . You're doing good. You're doing good. Start from the beginning and break it down for me. Just let it out. I wanna hear your said. Layed it all out. And then I'll come back with questions. Explain this well this is anybody else responsible?

Ms. Lucio:  No.

Texas Ranger:  Or am I talking to the right person? [Melissa nods head Yes]. Ok. Perfect. Tell me. Melissa tell me. Let's do this together. ok? Let's get it over with. Say yeah. We can get it over with and move on. Ok Melissa? Let's just get it over with.

Ms. Lucio:  I don't know what you want me to say. I'm responsible for it.

About thirty minutes later, and after viewing more photographs of her dead child, Ms. Lucio acquiesced again:

No. 16-70027

Constitution and disregards binding, bedrock Supreme Court law, is the government's simultaneous, successful effort excluding Ms. Lucio's one answer to why she might capitulate, namely that a lifetime of abuse had made her acquiescent, desirous to please and to accept responsibility, and to avoid confrontation.[5]

---

| | |
|---|---|
| Texas Ranger: | What about all these [inaudible] spots? On her vagina? |
| Ms. Lucio: | uh uh. I never did that. |
| Texas Ranger: | Who did? |
| Ms. Lucio: | [shaking head no] |
| Texas Ranger: | Your husband? |
| Ms. Lucio: | No. |
| Texas Ranger: | Why don't you wanna tell me? Why don't you wanna tell me? |
| Ms. Lucio: | I didn't do that and my husband didn't do that. Must been he would touched her when he would spank her. |
| Texas Ranger: | The who did it? |
| Ms. Lucio: | [Melissa shakes head no] |
| Texas Ranger: | Just tell me Melissa. . . . I can move on to the next. Get this picture out of your face. How did this happen? We know this is you …. You did this. |
| Ms. Lucio: | I guess I did it. I guess I did it. |
| Texas Ranger: | How? |
| Ms. Lucio: | I don't know. |
| Texas Ranger: | You would hit her there? |
| Ms. Lucio: | No. I never hit her there. |

Finally, at about 3:00 a.m.—five hours into the interrogation—Ms. Lucio uttered the phrase seized on by the government to convict her, remarking "I just did it" in the context of a series of questions about whether she bit Mariah.

[5] Notably again, Texas does not dispute that Pinkerman's detailed affidavit given after trial is in the state record and therefore is properly before us in reviewing whether the district court's ruling was violative of *Crane*. This affidavit further clarifies Pinkerman's

No. 16-70027

This case squarely implicates *Crane* and we do no harm—whipsaw no court—when we vindicate binding Supreme Court law that a defendant, especially a capital defendant—here a battered woman and mother—must be heard to answer why she acquiesced and told her interrogator, "I just did it."

---

testimony that "in [his] professional opinion her psychological characteristics increase the likelihood that she would acquiesce while providing her confession" due to being isolated for 5 hours, "repeatedly interrogated by male police officers in close quarters, not provided a place or opportunity to rest nor provided food or water." Pinkerman also would testify to Ms. Lucio's behavior based on her "emotional and physically abusive relationships with males," including being "very capable of making self-sacrifice in providing a false confession in order to avoid investigation of her children," several of whom had "bad behavioral disorders marked by severe aggression against the[ir] siblings," including Mariah. Pinkerman's proffer *therefore* interlocks with interrogation techniques used against Ms. Lucio where the interrogator targeted Ms. Lucio's desire for male approval. For example, at 1:22 a.m., so hours into interrogation, the interrogator offered to "to let [Ms. Lucio's] hair down" and "put it in a pony tail" and then left the room. After he returned, Ms. Lucio uttered her "I just did it" confession at about 3:00 a.m.